STATE OF NORTH CAROLINA v. ROGELIO ALONZO CASTELLON, DEFENDANT

No. COA01-949

(Filed 6 August 2002)

## 1. Arrest— traffic stop—25 minute detention—slow computer—developing suspicion

A traffic stop did not constitute an illegal seizure where defendant contended that a 25 minute detention for a warning ticket was unreasonable, but the officer developed a reasonable suspicion that criminal activity was afoot while he waited for his

computer to function, he was justified in asking for permission to search the vehicle, and defendant voluntarily consented to the search.

**2. Search and Seizure— consent to search car—packages seen inside television—removal of television panel**

Officers did not exceed the scope of defendant's consent to search a car where they found a television set in the trunk, saw saran-wrapped packages through openings in the back of the television, and removed the back panel of the television. The officers discovered the packages inadvertently, recognized that they contained contraband, and were justified in opening the television and seizing the cocaine in the packages.

Appeal by defendant from judgment entered 5 April 2001 by Judge E. Lynn Johnson in Cumberland County Superior Court. Heard in the Court of Appeals 14 May 2002.

*Attorney General Roy Cooper, by Assistant Attorney General Edwin L. Gavin II, for the State.*

*James R. Parish, for defendant-appellant.*

HUDSON, Judge.

Defendant assigned error to the trial court's denial of his motion to suppress. We affirm.

Following a hearing, the trial court made extensive findings of fact in its order denying defendant's motion to suppress. The evidence presented at the hearing tended to show that on 21 March 2000, defendant was stopped while driving on Interstate 95 by Sergeant Mark Hart of the Cumberland County Sheriff's Office for failure to wear his seatbelt. *See* N.C. Gen. Stat. § 20-135.2A(a) (2001). Luz Ibarra, a passenger in the vehicle, also was not wearing her seatbelt.

Before issuing a warning ticket, Sergeant Hart used his mobile data computer to check defendant's driver's license and to determine whether defendant "was a wanted person." The computer operated slowly. While Sergeant Hart was waiting for the computer to respond with the information, Deputy Timothy Bailer of the Cumberland County Sheriff's Office arrived at the scene. Sergeant Hart and Deputy Bailer observed several indicators of criminal activity. Thus, after ascertaining the validity of defendant's driver's license and issuing a warning ticket, Sergeant Hart asked for permission to search

defendant's vehicle. Defendant gave his consent, and during a search of the vehicle's trunk, Deputy Bailer found cocaine in the back of a television set.

Defendant was convicted following his plea of guilty to one count of trafficking in cocaine by possession and one count of trafficking in cocaine by transportation. He preserved his right to appeal the trial court's denial of his motion to suppress evidence, and he now appeals that ruling. *See* N.C. Gen. Stat. § 15A-979(b) (2001); *State v. Brown*, 142 N.C. App. 491, 543 S.E.2d 192 (2001).

**[1]** Defendant argues that the traffic stop constituted an illegal seizure, and, as a result, the evidence seized, as well as any inculpatory statements made during later questioning, must be suppressed. "[T]he scope of appellate review of an order such as this is strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). Further, "the trial court's ruling on a motion to suppress is afforded great deference upon appellate review as it has the duty to hear testimony and weigh the evidence." *State v. McClendon*, 130 N.C. App. 368, 377, 502 S.E.2d 902, 908 (1998), *aff'd*, 350 N.C. 630, 517 S.E.2d 128 (1999).

Defendant has not assigned error to any of the findings of fact made by the trial court, nor does he argue in his brief on appeal that the facts are not supported by competent evidence. Additionally, defendant does not contend that the initial traffic stop was unlawful. Rather, he argues that his detention for over twenty-five minutes for a minor traffic violation was unreasonable. This is a conclusion of law, which we review *de novo*.

The trial court's findings of fact indicate that Sergeant Hart performed the license check with his mobile data computer, which functioned slowly on that day. Specifically, the trial court made the following findings of fact:

10. Regarding his mobile data computer, there is not a normal response time for the information sought via the computer for reasons outside the deputy's control, such as the amount of use of the system by others.

11. Sergeant Hart asked the Defendant in English where he was coming from and his length of stay. The Defendant responded

in English that he was coming from New York and that he had been there for three or four days. Sergeant Hart explained to the Defendant in English that he was intending to issue the Defendant a warning ticket for the seat belt violation. The Defendant indicated that he understood what a warning ticket was. The mobile data computer operated slowly during the encounter, but ultimately began to provide information to Sergeant Hart regarding possible hits, that is, that people sharing the Defendant's name or a variation thereof were wanted. Particularly, one such "hit" indicated that the wanted person had a tatoo on his arm. Sergeant Hart asked the Defendant in English to lift his shirt sleeve, and the Defendant did so. Sergeant Hart did not see the described tattoo. He continued his investigation of the Defendant's identity, status of his driver's license, and status of being wanted. Sergeant Hart called EPIC [the El Paso Intelligence Center, a national database for criminal activity, including narcotic activity] to search their records for the existence of warrants and prior illegal activity. As with his mobile data computer, the EPIC system operated slowly during this encounter through no fault of Sergeant Hart.

12. At about 1:29 p.m., Sergeant Hart concluded his telephone call to EPIC, and Deputy Timothy Bailer with the Cumberland County Sheriff's Office arrived on the scene to assist Sergeant Hart. Sergeant Hart told the Defendant in English he would be writing him a warning ticket, but first he got out of the vehicle to speak with Deputy Bailer, a deputy who was also assigned to the interstate criminal enforcement unit and who had also been trained and had experience in conducting inter-diction along Interstate 95.

13. Within about one minute, Sergeant Hart advised Deputy Bailer of the situation and asked him to speak to Ms. Ibarra concerning the indicators of criminal activity. At about 1:30 p.m., Sergeant Hart then got back into his patrol car and began writing the warning ticket. At this point, Sergeant Hart was receiving the final information from his mobile data computer regarding the Defendant's driver's license. The information verified that the Defendant's license was valid.

14. As Sergeant Hart prepared the paperwork, he and the Defendant engaged in polite conversation in English

about the Defendant's country of origin, Cuba, and the events concerning the big news of the day, Elian. Within about two minutes, Deputy Bailer returned to Sergeant Hart's patrol car, whereupon Sergeant Hart got out to speak with him. Deputy Bailer told Sergeant Hart that Ms. Ibarra had told him that she and the Defendant were just friends despite a previous statement by the Defendant that they were married, that they had flown to New York the previous day, that they were only in New York for one day despite a previous statement by the Defendant that he had been in New York for the past three or four days, and that they were headed back to Miami, Florida.

15. As Deputy Bailer provided this information to Sergeant Hart, the audio equipment within Sergeant Hart's patrol car continued to function, and while the Defendant was alone within the patrol car, he twice said to himself in English, "This is not good."

16. At about 1:33 p.m., Sergeant Hart entered his patrol car with the Defendant. Within three minutes, Sergeant Hart completed the warning ticket, returned to the Defendant his driver's license and the rental agreement, and asked the Defendant in English if he understood everything, to which the Defendant said he did. At about 1:37 p.m., as the Defendant began to exit the patrol vehicle, Sergeant Hart asked him in English if he had any weapons in the vehicle, to which the Defendant said, "No." Sergeant Hart then asked the Defendant in English if he had any illegal narcotics, marijuana, in the vehicle, and the Defendant again said, "No." Sergeant Hart then asked the Defendant in English if he had any large amounts of currency in the vehicle, and the Defendant said, "No." Sergeant Hart then asked the Defendant in English for permission to search the vehicle. The Defendant said, "Huh?" or "What?" Sergeant Hart asked, "Can I have permission to search the car?" The Defendant pointed at the rental vehicle and asked, "The car?" Sergeant Hart said, "Yes." The Defendant said, "Yes." Sergeant Hart asked, "No problem?" The Defendant said, "No problem." Sergeant Hart asked, "Are you sure?" The Defendant said, "No problem." The Defendant gave Sergeant Hart general consent to search the vehicle.

The detention for the purpose of determining the validity of defendant's license was not unreasonable. *See State v. Munoz*, 141 N.C. App. 675, 682, 541 S.E.2d 218, 222, *cert. denied*, 353 N.C. 454, 548 S.E.2d 534 (2001).

"Once the original purpose of the stop has been addressed, there must be grounds which provide a reasonable and articulable suspicion in order to justify further delay." *State v. Falana*, 129 N.C. App. 813, 816, 501 S.E.2d 358, 360 (1998); *see State v. McClendon*, 350 N.C. 630, 636, 517 S.E.2d 128, 132 (1999) ("In order to further detain a person after lawfully stopping him, an officer must have reasonable suspicion, based on specific and articulable facts, that criminal activity is afoot."). In determining whether further detention was reasonable, the trial court must consider the totality of the circumstances. *See Munoz*, 141 N.C. at 682, 541 S.E.2d at 222. "In its analysis, the court must view the facts through the eyes of a reasonable, cautious officer, guided by his experience and training at the time he determined to detain defendant." *Id.* (internal quotation marks omitted).

During the time legitimately required for Sergeant Hart to issue a warning ticket to defendant, he developed reasonable and articulable suspicion that defendant was involved in illegal drug activity. As the trial court found, Sergeant Hart noticed that defendant's hands "were very shaky, trembling, and real sweaty." After examining the rental agreement, Sergeant Hart

> immediately noticed several indicators of criminal activity, particularly drug interdiction, from his training and experience. He noticed that the rental agreement was in the name of a third person allegedly not present at the scene, Fabian Loaiza. The vehicle had been rented on a short-term basis, having been rented on March 20, 2000 at La Guardia airport in New York, New York with a return date of March 23, 2000 in Miami, Florida. These facts were significant to Sergeant Hart because (1) people transporting narcotics prefer to distance themselves from the vehicle they are using to transport narcotics by using third party rentals, (2) Miami, Florida and New York, New York are source cities for narcotics to include cocaine, and (3) short-term rentals tend to negate the possibility that the people are on vacation or conducting regular business activities.

The evidence supports this finding. Further, after Deputy Bailer spoke with Ibarra, the officers determined that there were some discrepancies in what defendant and Ibarra told the officers. For exam-

ple, defendant told Sergeant Hart that Ibarra was his wife and that they had spent three or four days in New York. Ibarra told Deputy Bailer that she and defendant were friends and that they had been in New York for only a day.

We hold that, based on the above, the trial court did not err in concluding that Sergeant Hart had reasonable suspicion that criminal activity was afoot. Therefore, Sergeant Hart was justified in asking for permission to search the vehicle, and defendant's further detention was not unconstitutional. *See State v. Aubin,* 100 N.C. App. 628, 632-33, 397 S.E.2d 653, 655-56 (1990), *disc. review denied,* 328 N.C. 334, 402 S.E.2d 433, *cert. denied sub nom. Aubin v. North Carolina,* 502 U.S. 842, 116 L. Ed. 2d 101 (1991); *State v. Morocco,* 99 N.C. App. 421, 427-29, 393 S.E.2d 545, 549 (1990).

Because defendant's original seizure was not unconstitutional, we reject his assertion that his consent to the search was "tainted" because it was "the result of the coercive effects of this unreasonable detention." In view of the fact that defendant's initial detention was not unlawful, "the State was required to show only that defendant's consent to the search was freely given, and was not the product of coercion." *Munoz,* 141 N.C. App. at 683, 541 S.E.2d at 223. Based on Sergeant Hart's testimony at the hearing, the trial court found that defendant consented to the search. The court concluded that "[u]nder the totality of the circumstances, the Defendant voluntarily gave Sergeant Hart general consent to search the vehicle. The consent was voluntary and not the product of duress or coercion, express or implied." The trial court's conclusion of law is supported by appropriate findings of fact, which are, in turn, supported by competent evidence. Therefore, we reject defendant's assertion that his consent was tainted.

[2] Finally, defendant argues that, even if his consent was voluntary, the officers' search exceeded the scope of that consent. In particular, defendant contends that the officers did not have the right to unscrew the back of the television set. We disagree.

Under the plain view doctrine, "police may seize contraband or evidence if (1) the officer was in a place where he had a right to be when the evidence was discovered; (2) the evidence was discovered inadvertently; and (3) it was immediately apparent to the police that the items observed were evidence of a crime or contraband." *State v. Graves,* 135 N.C. App. 216, 219, 519 S.E.2d 770, 772 (1999). Here, the trial court found that defendant gave general consent to search the

vehicle, which allowed the officers to search the trunk of the car. *See Aubin*, 100 N.C. App. at 634, 397 S.E.2d at 656. The trial court made the following finding of fact regarding the search of the trunk:

18. Sergeant Hart and Deputy Bailer began to search the rental vehicle. Deputy Bailer began his search in the trunk of the vehicle, and within about two minutes, he discovered what he believed to be illegal narcotics in saran wrap packaging inside a television set lying face down in the trunk of the vehicle. Both Sergeant Hart and Deputy Bailer observed the packaging inside the television through openings in the back of it. The packaging was plainly visible inside the television without the need to manipulate the television. In both deputies' training and experience, the packaging was consistent with the packaging of narcotics to include cocaine, heroin, and marijuana. Deputy Bailer also noted that the screws on the back of the television had previously been scratched. Deputy Bailer removed the back panel of the television and discovered two packages containing approximately 3,000 grams of cocaine.

This finding is supported by the evidence. Deputy Bailer testified at the suppression hearing regarding his search of the trunk as follows:

Q. What did you do? Just tell the Court how you proceeded to search the trunk of the vehicle.

A. Okay. I released the trunk release on the driver's side floorboard, walked back to the trunk. It was fully opened. I fully opened it to where I could look inside the trunk of the vehicle. While I looked inside the trunk of the vehicle, I noticed two luggage bags and a plastic bag with a paper bag inside of it containing two empty milk jugs and then a T.V. set, the screen of the television set face down to the trunk of the vehicle. I looked at the back of the T.V. set and saw a shiny glare coming off of the T.V. set inside of the back panel where the vents are on the television set. I looked into it very closely, thought I saw a package in the— inside of the back panel of the T.V. set. At that time, I took my fingers and spread the plastic vents a little further apart where I could look a little easier and I did locate a large package of saran wrap—a package wrapped in saran wrap. I notified Sergeant Hart at this time of what I located. . . .

. . . .

Q. When you saw that package in this television set, had you ever seen anything similar to that in your training and experience as a law enforcement officer?

A. Yes.

Q. What types of packages would that be, sir?

A. Cocaine, marijuana, heroin, all illegal contraband are all commonly packaged with saran wrap or duct tape with a masking agent of some sort to deter the police canine dogs. If they are stopped and a canine is utilized, they do that specifically to try and draw the dog's attention off of the packages.

Thus, the officers discovered the saran-wrapped packages inadvertently and recognized immediately that they contained contraband. The officers were, therefore, justified in opening the set and seizing the cocaine.

We conclude that the officers did not unreasonably detain defendant, defendant voluntarily agreed to a search of his automobile, and the officers did not exceed the scope of the authorized search. Accordingly, the trial court's order denying defendant's motion to suppress is affirmed.

Affirmed.

Judges GREENE and BIGGS concur.