751 N.W.2d 668 (2008)
16 Neb. App. 799
STATE of Nebraska, Appellee,
v.
Shawn K. RATHJEN, Appellant.
No. A-07-682.
Court of Appeals of Nebraska.
June 17, 2008.
*670 Eric J. Williams, York County Public Defender, for appellant.
Jon Bruning, Attorney General, and George R. Love for appellee.
SIEVERS, MOORE, and CASSEL, Judges.
CASSEL, Judge.

INTRODUCTION
Following the conviction and sentencing of Shawn K. Rathjen for possession of methamphetamine, he appeals, challenging only the order overruling his pretrial motion to suppress evidence obtained during a warrantless search of a locked toolbox located in the bed of his pickup truck. We conclude that the district court's finding that Rathjen consented to the search of his vehicle and implicit finding that such consent extended to the search of the locked toolbox were not clearly erroneous. We therefore affirm.

*671 BACKGROUND
On March 18, 2006, an officer stopped Rathjen for committing a traffic infraction and arrested him after a search of his vehicle revealed that he was in possession of methamphetamine. Rathjen thereafter was charged by information with possession of a controlled substance with intent to distribute or deliver, a Class IC felony, and entered a plea of not guilty. He later filed an amended motion to suppress. He requested an order suppressing all evidence acquired from the search of his vehicle, alleging that the stop and search violated the Fourth Amendment because (1) there was no valid reason for the traffic stop, or for the continued detention and seizure of Rathjen after he was issued a traffic citation; (2) Rathjen did not freely and voluntarily consent to the warrantless search of his vehicle, which was otherwise tainted by the unlawful detention; and (3) law enforcement officers exceeded the scope of any consent to search by searching a locked container which was outside of the vehicle and for which Rathjen had a reasonable expectation of privacy, without obtaining additional consent to do so. Rathjen also asserted that his rights under the 5th and 14th Amendments were violated.
On May 1 and 3, 2006, the court held a hearing on the amended motion to suppress where the following testimony was adduced: Robert A. Penner, a deputy sheriff for York County, Nebraska, testified that Rathjen was arrested on March 18. His testimony demonstrated that he has extensive training and experience in conducting drug investigations. He testified that shortly after 2 a.m. on March 18, he was patrolling on U.S. Highway 34 in York County. He testified that he was traveling east when he passed a pickup truck that was traveling west. After he passed the pickup truck, he looked in his rearview mirror and noticed that one of its taillights was not illuminated. He thereafter turned his patrol car around, activated his emergency lights, and stopped the pickup truck.
Penner testified that anytime that he activates his emergency lights, a video camera automatically begins recording. The stop of Rathjen's vehicle was recorded, and the recording is included in the evidentiary record.
Penner approached the driver of the vehicle, whom he identified as Rathjen, and advised Rathjen that he had been stopped because one of his vehicle's taillights was out. Rathjen responded by looking at his female passenger and exclaiming, "Damn." Rathjen then commented that he had recently fixed one of the taillights.
Penner requested and received from Rathjen his operator's license, vehicle registration, and a vehicle insurance card. The insurance card was expired. Penner then asked Rathjen some routine questions and learned that Rathjen's destination was Clarks, Nebraska, to pick up his children. Penner opined that Clarks was approximately a 35-minute drive from the scene of the traffic stop.
Penner returned to his patrol car, where he checked the status of Rathjen's operator's license and vehicle insurance, and ordered a criminal history check on Rathjen. He was unable to obtain verification that the vehicle was insured, but was notified that Rathjen had previous charges for possession of marijuana and methamphetamine.
Penner returned to Rathjen's vehicle, ordered Rathjen to exit the vehicle, and showed Rathjen "[t]he rear of the vehicle." He issued Rathjen a citation for failure to present proof of insurance and a defect ticket for the taillight violation. Penner testified that he had not arrested Rathjen at that point. After Rathjen signed the *672 citation, Penner advised Rathjen that "he was good to go, basically that he could leave," but as Rathjen began to leave, Penner asked Rathjen for permission to ask him another question. According to Penner, in response, Rathjen "stopped and stood there" and said "something to the effect of yes." Penner did not tell Rathjen that he was not free to leave at that point. Penner asked Rathjen if he had anything illegal in his vehicle, to which Rathjen responded that he did not and that "`[t]hat was a long time ago.'" Rathjen elaborated that he had been in trouble in the past for possession of marijuana and methamphetamine. Penner then asked Rathjen if he could search his vehicle, to which Rathjen responded that "it was fine." Penner also requested and received consent to conduct a pat-down search of Rathjen's person. He discovered nothing illegal in the pat-down search.
Penner then asked the female passenger to exit the vehicle. She complied with Penner's request and exited the vehicle carrying her purse, which she appeared to Penner to be trying to conceal under her coat. Penner asked for and received permission to search her purse. Penner discovered a glass pipe with a "whitish film inside of it" that he believed had been used to smoke methamphetamine. He also found a "plastic self-sealing baggie" containing a "crystal white substance" that appeared to Penner to be methamphetamine. He arrested the passenger, at which time Rathjen commented that "she needed to quit doing that."
Penner then searched the passenger compartment of Rathjen's pickup truck. He testified that he was "looking for any place that [he] felt it could [sic] be able to conceal any type of methamphetamine or contraband," but did not find anything in the passenger compartment.
He then searched a toolbox located in the bed of the pickup truck. The bed of the pickup truck did not have "any sort of camper or shell" on it. The toolbox was positioned against the passenger compartment and extended the entire width of the pickup truck's bed. Although Rathjen testified that he had a "locked container attached to [his] vehicle," it is unclear from the record whether the toolbox was permanently affixed to the bed of the pickup truck. However, the nature of the toolbox makes it likely that it remained in the bed of the pickup truck at all times.
Penner testified that the toolbox was locked and that he opened it using the toolbox key on the keyring hanging from the key in the ignition. During his search of the toolbox, Penner discovered a black bag that appeared to him to be a shaving kit. He searched inside the unlocked bag and discovered some mail addressed to Rathjen, a couple of electronic scales, a cigar in a glass container, a glass pipe, three empty self-sealing baggies, and a bag containing a "large amount of a crystal substance that [Penner] believed to be crystal meth[amphetamine]." Rathjen was thereafter placed under arrest, and he commented that "`[t]hat was her bag that you found.'"
On cross-examination, Penner testified that he asked for Rathjen's consent to search his vehicle because he had a "hunch" that Rathjen was engaged in criminal activity. Penner stated that before he requested consent for the search, he did not see or sense any illegal activity or the presence of any contraband, but did note suspicious activity. He testified that the suspicious activity he noticed included Rathjen's "tone of voice" and the "urgency" with which he looked at his female passenger after he learned that he had a taillight out. He also testified that Rathjen appeared "fairly nervous" for just having a taillight out.
*673 Penner admitted that he did not ask Rathjen for additional consent before searching the toolbox. Rathjen did not assist in the search, and Penner testified that Rathjen was neither present nor within earshot when he searched the toolbox. When asked if he had any reason to believe that Rathjen had consented to the search of the toolbox, Penner responded, "He didn't say I couldn't."
Sgt. Don Copeland, a deputy sheriff for York County, testified that he arrived on the scene shortly after Rathjen consented to the search of his vehicle and right before Penner arrested the female passenger. Copeland performed a pat-down search of Rathjen upon Penner's request, but did not find anything out of the ordinary. Copeland stood behind Rathjen's vehicle with Rathjen while Penner searched the passenger compartment of the vehicle. Rathjen did not indicate to Copeland at any point that he wanted to withdraw his consent to the search. After some time, Rathjen asked if he could get his coat, which Penner gave to him. It was cold out that night, so Copeland asked Rathjen if he wanted to sit in Copeland's patrol car. Rathjen accepted the invitation, and both Rathjen and Copeland sat in Copeland's patrol car until Penner told Copeland to arrest Rathjen. At that point, Copeland and Rathjen exited the car and Rathjen was placed under arrest.
On cross-examination, Copeland testified that he and Rathjen entered his patrol car prior to Penner's search of the toolbox. He testified that his patrol car was located behind Penner's patrol car, which was parked behind Rathjen's vehicle. He estimated that his patrol car was "three car lengths" behind Rathjen's pickup truck during the search.
Rathjen testified that he did not believe he was free to leave after Penner issued him a citation and returned his operator's license, because Penner almost immediately thereafter asked him more questions that he believed he was required to answer. He testified that he felt pressure to remain. He admitted that he consented to the search of his vehicle, but stated that he believed he did not have the right to deny consent. He denied giving Penner permission to search the locked toolbox, which he expected was a private area. He testified that he was in Copeland's patrol car when Penner searched the toolbox and that he was not in a position where he could have objected to such search.
On July 28, 2006, the district court entered a six-page order denying Rathjen's motion to suppress. The court stated that it believed Penner's testimony on all factually contested points. The court determined that Penner had probable cause for the traffic stop because Rathjen's vehicle had one taillight that was not showing red as required by statute. The court also determined that Penner's initial questions and requests for information were valid officer activities. The court determined that Rathjen was not restrained after he received the citation and defect ticket.
With regard to consent for the search, the district court determined that no facts indicated that Penner forced Rathjen to comply with the vehicle search request. The court found that Penner did not know that the toolbox was locked when he asked for consent to search the vehicle and did not seek separate consent to search the toolbox. The court also found that Rathjen did not limit the coverage of his consent for the search. The court concluded that Rathjen gave valid consent for the search of his pickup truck and toolbox and that regardless of the consent, Penner had "sufficient probable cause to search the pickup and locked toolbox without consent."
The case proceeded to a jury trial. On March 14, 2007, Rathjen was found guilty *674 of possession of methamphetamine and sentenced to 3 years' probation.
Rathjen timely appeals.

ASSIGNMENT OF ERROR
Rathjen's sole assignment of error is that the district court erred in overruling his motion to suppress.

STANDARD OF REVIEW
[1] A trial court's ruling on a motion to suppress, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, will be upheld unless its findings of fact are clearly erroneous. In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. State v. Tucker, 262 Neb. 940, 636 N.W.2d 853 (2001); State v. McGinnis, 8 Neb.App. 1014, 608 N.W.2d 605 (2000).

ANALYSIS
[2, 3] Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect against unreasonable searches and seizures by the government. State v. Konfrst, 251 Neb. 214, 556 N.W.2d 250 (1996). Searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions. Id. The recognized exceptions to the Fourth Amendment's warrant requirement as applied to automobiles include probable cause, exigent circumstances, consent, search incident to arrest, inventory search, and plain view. State v. Konfrst, supra. The State has the burden to prove that one of these circumstances was present during a warrantless search. State v. Hisey, 15 Neb.App. 100, 723 N.W.2d 99 (2006).
[4] Rathjen asserts that none of the exceptions to the warrant requirement were present during Penner's search of his toolbox. However, he focuses his argument on three of the exceptions, asserting that the search (1) was not conducted pursuant to valid consent, (2) was not conducted incident to an arrest, and (3) was not justified by the existence of probable cause. Because we ultimately conclude that the search of the toolbox was conducted pursuant to Rathjen's valid consent, we need not consider any of the other exceptions.
[5-7] To address Rathjen's argument regarding consent, we recall the legal standards governing the issue. In order for a consent to search to be effective, it must be a free and unconstrained choice and not the product of a will overborne. See State v. Ready, 252 Neb. 816, 565 N.W.2d 728 (1997). The consent must be given voluntarily and not as the result of duress or coercion, whether express, implied, physical, or psychological. Id. In order to determine whether a person's consent to search was voluntarily given, a court must review the totality of the circumstances. Id. As stated above, the findings of fact in this respect will not be set aside on appeal unless they are clearly erroneous. See State v. Graham, 241 Neb. 995, 492 N.W.2d 845 (1992).
The district court made several factual findings regarding the circumstances surrounding Rathjen's consent to the search. The court found that the officers did not restrain Rathjen at any time prior to his arrest. The court also found that Penner did not use intimidating words or gestures to obtain Rathjen's consent, but instead found that Penner was "cordial and polite" when he requested consent for the search. The court further concluded that Rathjen *675 was not impaired when he granted Penner consent for the search. Based upon these findings, the court concluded that Rathjen's consent to the search was valid.
We have reviewed the record and conclude that the district court's factual findings were not clearly erroneous. Penner testified during the hearing on the motion to suppress that he asked Rathjen if he could "search the vehicle," to which Rathjen responded that "it was fine." Rathjen voluntarily consented to the search of his vehicle. We next consider the scope of Rathjen's consent.
[8] A consensual search by its very definition is circumscribed by the extent of the permission given, as determined by the totality of the circumstances. State v. Wells, 539 So.2d 464 (Fla.1989), affirmed on other grounds 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990). The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonablenesswhat would the typical reasonable person have understood by the exchange between the officer and the suspect? Florida v. Jimeno, 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). See, also, U.S. v. Siwek, 453 F.3d 1079 (8th Cir.2006).
[9] Because we view the locked toolbox in this case as analogous to the trunk of an automobile, we observe that several courts have concluded that a suspect's general consent to a vehicle search permitted officers to search the vehicle's trunk. See, e.g., State v. Dunkel, 143 P.3d 290 (Utah App.2006) (general consent to search vehicle for drugs extended scope of search to trunk and most containers found therein that could contain narcotics); State v. Castellon, 151 N.C.App. 675, 566 S.E.2d 696 (2002) (suspect's general consent to search vehicle allowed officers to search trunk of car). These cases support the notion that Rathjen's response constituted a general consent which authorized Penner to search the locked toolbox.
[10] After determining that Rathjen's initial response extended authorization to the locked toolbox, we next consider whether Rathjen otherwise limited the scope of his consent to the passenger compartment. Whether there were any limitations placed on the consent given and whether the search conformed to those limitations are questions of fact to be determined by the totality of the circumstances. State v. Tucker, 262 Neb. 940, 636 N.W.2d 853 (2001).
The circumstances would allow the district court to conclude that Rathjen did not limit the scope of the consent. Penner testified that Rathjen did not say that Penner could not search the toolbox. In light of the conversation that took place immediately prior to Rathjen's granting consent for the search, the court could find that Rathjen knew that one of the items that Penner would search for was narcotics. The toolbox was a place where one could reasonably expect illegal substances, such as narcotics, to be hidden. The key to unlock the toolbox was on the keyring hanging from the key in the ignition.
The district court made findings consistent with the evidence. The court found that Penner did not seek separate consent to search the toolbox, but did not know that the toolbox was locked when he requested consent for the search. The court also found that Rathjen did not limit the scope of his consent. It further found that Rathjen did not attempt to revoke or limit his consent to the search after Penner commenced the search. We find that it was not clearly erroneous for the district court to implicitly conclude that a reasonable person would have understood the exchange between Penner and Rathjen to include consent to search the toolbox.
*676 [11] We also find significant the fact that Rathjen did not object when the search extended to the toolbox. Whether one who consents later objects to an ongoing search is a significant inquiry determining whether there is a limitation placed on the scope of the consent that has been granted. State v. Claus, 8 Neb.App. 430, 594 N.W.2d 685 (1999). Although Rathjen was in Copeland's patrol car when Penner searched the toolbox, Rathjen did not testify that his view was impaired. Penner searched the passenger compartment while Rathjen watched. Rathjen knew that the search was continuing after he entered Copeland's patrol car. He also left the key to the toolbox in the passenger compartment and did not tell Penner that he did not have Rathjen's permission to utilize the key to unlock the toolbox.

CONCLUSION
The district court's findings that Rathjen consented to the search of his vehicle and that such consent extended to the locked toolbox were not clearly erroneous. The district court therefore did not err in overruling Rathjen's motion to suppress evidence discovered during the search. We affirm the court's judgment.
AFFIRMED.