782 N.W.2d 16 (2010)
279 Neb. 841
STATE of Nebraska, appellee,
v.
Terrence K. GORUP, appellant.
No. S-09-086.
Supreme Court of Nebraska.
May 14, 2010.
*21 Ann C. Addison-Wageman, Bellevue, for appellant.
Jon Bruning, Attorney General, and George R. Love, Columbus, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, J.

SUMMARY
This is Terrence K. Gorup's second appeal from his conviction and sentence for possession of a controlled substance, methamphetamine. In State v. Gorup (Gorup I),[1] Gorup argued that the court erred in failing to suppress evidence because his consent was an exploitation of a prior illegal search. We vacated his conviction and sentence and remanded the cause for the court to consider two issues: (1) whether the search-incident-to-arrest exception to *22 the warrant requirement applied; and (2) whether Gorup's consent was tainted by a prior illegal search.
Following remand, the court heard additional evidence. It concluded that the initial search of Gorup's apartment was illegal but that Gorup's consent was not an exploitation of a prior illegality.
We reverse, and remand for a new trial. We conclude that Gorup's consent was not sufficiently attenuated from the purported search incident to arrest to dissipate the taint of the illegal search. Because his consent to search was the fruit of the poisonous tree, the court erred in failing to exclude evidence seized under his consent.

BACKGROUND
In Gorup I, we stated the underlying facts as follows:
In July 2006, the Bellevue Police Department conducted an investigation of Gorup, who was suspected of dealing narcotics from his apartment. When it was discovered that Gorup had a warrant outstanding for failure to appear on a previous drug violation, two detectives formulated a plan to go to Gorup's apartment and conduct a "knock-and-talk investigation" with Gorup concerning suspected drug trafficking. Their objective was to obtain Gorup's consent to search his apartment.
On July 31, 2006, the detectives arrived at Gorup's apartment in an unmarked police vehicle. As they approached the apartment, a male was seen leaving. When asked if Gorup was home, the man replied in the affirmative. The man returned to the apartment, opened the door, and informed Gorup that someone was there to see him. Gorup appeared and began to exit the apartment. As he approached the threshold of the doorway, a detective informed Gorup that he was under arrest. At that point, Gorup, who was standing directly outside his apartment door, was placed in handcuffs. He was not transported from the scene immediately because a marked police car was not available.
While standing at the door, a detective noticed a person sitting on a couch inside the apartment. He also observed some blade-edged weapons. Gorup informed the detectives that a couple of people were in the apartment. After waiting for a uniformed officer to arrive, the detectives performed what they described as a "protective sweep" of the apartment. The individuals in the apartment were escorted to the living room. A detective then performed what he described as a "search incident to arrest." In doing so, he searched a "small black zippered-type case" located on a table just inside the doorway, 4 or 5 feet away from Gorup. The case was not zipped shut, and inside, the detective saw "a couple [of] bags" that he recognized from his "training and experience as [being] methamphetamine." He left the bags inside the case on the table.
During this time, Gorup remained in the hallway with his hands cuffed behind his back. It is unknown whether Gorup could observe the detectives' activity. One detective testified that a wall probably would have obstructed Gorup's view of the detectives' activity inside the apartment. Though not specified in the record, the parties stated at oral argument that this activity continued for about 30 minutes.
After this search, one of the detectives directed the uniformed officer to escort Gorup to the marked police car. The same detective followed Gorup to the car, and while Gorup was seated in the police car, the detective requested Gorup's consent to search the apartment. *23 Gorup was informed several times that he did not have to provide his consent. The detective testified that Gorup gave his consent to a search of the apartment.
This subsequent search revealed several items of contraband in addition to the bags of methamphetamine in the black zippered case. After the search, the detective returned to the police car and read Gorup his Miranda rights. The detective told Gorup about the black zippered case. Gorup admitted that he knew of the case but denied that it was his. The detective stated Gorup told him that Gorup had been selling methamphetamine to raise money so he could move from his apartment.
Before trial, Gorup moved to suppress all items of physical evidence seized from his apartment. The district court overruled the motion. The court found that the initial warrantless search of Gorup's apartment was not lawful as a protective sweep and might have been unlawful as a search incident to arrest. It found that the subsequent consent to the search of the apartment was voluntary and therefore served as an adequate basis for the seizure of the "hygiene case" and the contents thereof. It found that although Gorup knew that the detectives had entered his apartment, he did not know whether incriminating evidence had been found when he gave his consent to search the apartment.
After a stipulated bench trial, the district court convicted Gorup of possession of a controlled substance, methamphetamine, and sentenced him to a term of 1 to 3 years' imprisonment, granting him credit for 249 days spent in jail awaiting disposition of this charge.[2]
In Gorup I, Gorup assigned that the court erred in failing to suppress evidence found during the detectives' search of his apartment because the detectives had already illegally searched his apartment before he consented. He argued that the prior illegality tainted his consent for the detectives to search again. We concluded that the court failed to determine whether the search was valid as a search incident to arrest and whether the detectives obtained Gorup's consent by exploiting an illegal search.
We explained that when a person gives law enforcement officers consent to search following their illegal entry, a court should admit the evidence only if the consent meets two conditions: (1) the consent was voluntary; and (2) it was not obtained through an exploitation of the illegal entry. We recognized that the court found Gorup's consent was voluntary because the detectives had advised Gorup that he could refuse consent and had not confronted him with the evidence they had uncovered. But we concluded that the court failed to consider the appropriate factors for determining whether Gorup's consent to search was an exploitation of an illegal entry.
We vacated Gorup's conviction and sentence and remanded the cause for the court to consider two issues: (1) whether the search-incident-to-arrest exception to the warrant requirement applied; and (2) if not, whether Gorup's consent was tainted by the illegal search and must be excluded as the "fruit of the poisonous tree." We also set out specific factors for the court to consider in determining whether Gorup's consent was purged of the taint of an illegal search.

ADDITIONAL EVIDENCE ON REMAND
Two detectives, Zeb Simones and John Stuck, who investigated drug crimes for *24 the Bellevue Police Department, arrested Gorup. Simones was the only witness to testify at the original suppression hearing. At the second suppression hearing after remand, the court received Stuck's deposition.
Both detectives testified that they immediately handcuffed Gorup after he identified himself. Stuck testified that they first asked Gorup to step outside and that Simones entered the apartment while Stuck was handcuffing Gorup. Stuck stated that he believed at this time there was a valid felony arrest warrant for Gorup. The record fails to show an arrest warrant. Stuck also knew that another police officer had gone to Gorup's apartment about 2 weeks earlier and asked Gorup for consent to search his apartment. Stuck knew that Gorup had refused to give that officer consent to search.
Stuck testified that when he handcuffed Gorup, he was outside the apartment door in the hallway. Stuck stated that he was accompanied by a uniformed officer, who was standing directly in front of Gorup and had a patrol car parked just outside the apartment building. He testified that about 5 minutes after Simones found the methamphetamine in the black bag, Stuck and the officer placed Gorup in the patrol car. Stuck stated that as they were taking Gorup outside the apartment building, Simones showed Stuck the contents of the black bag but that Gorup was far enough away that he could not have seen the bag.
On cross-examination, however, Stuck stated that it was probably closer to 1 to 2 minutes from the time he handcuffed Gorup until he and the officer placed Gorup into the patrol car. He stated that the protective sweep search took 1 to 2 minutes and that the search incident to arrest took 1 minute. Stuck did not state that the detectives had to wait for a uniformed officer to arrive in a patrol car before they could transport Gorup.
Stuck also explained where Gorup was standing while Simones conducted the "search incident to arrest" inside Gorup's apartment. He testified that during this search, Gorup stood handcuffed just outside the door, with the door to Gorup's immediate left. He stated that Simones found the black zippered bag on a table a little over an arm's length from the door. And he said that Gorup was a little in front of the doorjamb and would have needed to lean backward to see inside the apartment. He said that Gorup did not do this.

DISTRICT COURT'S ORDER
We pause to explain why our remand in Gorup I required the court to consider whether it must exclude the evidence the detectives obtained during their second search under Gorup's consent. When an illegal search precedes a consent to search, law enforcement officers must have obtained the consent through means sufficiently distinguishable from the illegal search to be considered an independent act of free will.[3] If the consent to search was not sufficiently attenuated, it is invalid as an exploitation of the prior illegal act and a court must exclude both the consent and the evidence found as a result of that consent as fruit of the poisonous tree.[4]
On remand, the district court adopted its findings from the first suppression order. The court concluded that the search of the black bag was not a valid search incident to arrest and that no exigent circumstances justified the search of the bag. It then analyzed the three attenuation factors that we set forth in Gorup I and *25 concluded that the evidence was admissible.
Considering the temporal proximity factor, the court found that the protective sweep and the search incident to arrest, combined, took about 2 minutes. It further found that the time from the illegal entry to Gorup's consent was, at most, 10 minutes, and that this factor favored exclusion.
Regarding intervening circumstances, the court found that Simones had told Gorup on several occasions that Gorup could refuse consent. It concluded that this factor weighed against exclusion.
The court examined the purpose and flagrancy of the detectives' misconduct and concluded that this factor was neutral. The court concluded that it "cannot find that the search incident to arrest was an obvious violation of [Gorup's] constitutional rights." It further stated that it "cannot find that [the detectives] recognized that such an intrusion was, on its face, unconstitutional." Yet, it also found that the detectives' purpose was "investigatory in design and that the search was executed in the hope that contraband would be found."
But the court concluded that it could consider other factors because of the unique facts of the case. It found that although Gorup likely knew an officer had entered his apartment, Gorup had not observed Simones' discovery of the bag or its contents. And the detectives had not confronted him with the evidence. The court concluded that the evidence established that Gorup "was not aware that the contraband was discovered":
At best, [Gorup] knew that an officer or officers were inside his apartment for a period of approximately two minutes. Following that brief search, consent was requested after [Gorup] was thoroughly informed of his right to refuse consent. This unique factor must be considered in conjunction with the foregoing factors as to whether the consent was the fruit of the prior illegal search. Although a close case, based on the totality of the circumstances, including the factors prescribed by the Nebraska Supreme Court in its opinion, this Court finds that Gorup's consent was not an exploitation of the prior search and, therefore, not "fruit of the poisonous tree."
(Emphasis supplied.) Accordingly, the court overruled Gorup's motion to suppress. Gorup waived his right to a jury trial. After a stipulated bench trial, the court found Gorup guilty of the charged offense and sentenced him to 1 to 3 years' imprisonment, with credit for time served.

ASSIGNMENTS OF ERROR
Gorup assigns that the court erred in overruling his motion to suppress and in admitting evidence at trial that the police obtained through an unreasonable search and seizure.

STANDARD OF REVIEW
As noted, in Gorup I,[5] we set forth a two-part inquiry for determining whether evidence is admissible based on a suspect's consent to search following an illegal entry. We stated:
Where a search following an illegal entry is justified based on alleged consent, a court must determine whether that consent was voluntary, and in addition, the court must determine whether the illegal entry tainted that consent.[6] These two questions are not the same, and "`consequently the evidence obtained by the purported consent should *26 be held admissible only if it is determined that the consent was both voluntary and not an exploitation of the prior illegality.'"[7] Therefore, in analyzing this consent to search, there are two issues presented: (1) the voluntariness of the consent under the totality of the circumstances and (2) exploitation under the fruit of the poisonous tree doctrine.[8]
Federal courts also apply a two-part inquiry. It is true that courts have sometimes considered whether a consent to search was voluntary in their attenuation analysis.[9] But consistent with the U.S. Supreme Court's analysis in Wong Sun v. United States[10] and Brown v. Illinois,[11] federal courts generally hold that when a consensual search is preceded by a Fourth Amendment violation, the prosecution must prove two things: (1) the consent was voluntary; and (2) the police obtained the statement through means sufficiently distinguishable to be purged of the primary taint of that illegality.[12]
In Brown, the U.S. Supreme Court stated that even if a statement was voluntary under the Fifth Amendment, the Fourth Amendment issue remains. So even if a consent to search is voluntary, a court must consider the evidence's admissibility in the light of the Fourth Amendment's distinct policies and interests.[13]
We have recently held that in reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, we will apply a two-part standard of review. We review the trial court's findings of historical facts for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination.[14]
More specifically, we have recently applied the same two-part standard to review whether a consent to search was voluntary.[15] In that case, we were not discussing whether a consent to search was voluntary under the Fifth Amendment,[16] but whether the Fourth Amendment required the evidence's exclusion to protect its prohibition against unreasonable searches and seizures. In determining whether the exclusionary rule applies, we are concerned not only with the Fourth Amendment's privacy interests, but also with deterrence and judicial integrity.[17] In the light of our more recent holdings, *27 we conclude that the two-part standard of review should apply to this Fourth Amendment issue also. Accordingly, when the State seeks to submit evidence as sufficiently attenuated from a previous Fourth Amendment violation, we will review the trial court's findings of historical facts for clear error but review de novo the court's ultimate attenuation determination based on those facts.[18]

ANALYSIS
Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions, which must be strictly confined by their justifications.[19] The warrantless search exceptions recognized by this court include: (1) searches undertaken with consent or with probable cause, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest.[20]
On remand, we directed the court to consider only two exceptions: the search-incident-to-arrest exception and the consent exception. We directed the court to determine whether the consent was an exploitation of the previous illegal search under the factors we set out. The court concluded that the search-incident-to-arrest exception did not apply. The only issue presented by this appeal is whether Gorup's consent to search an area was valid after the police had conducted an illegal search of the same area.
The court again found that Gorup's consent to search was voluntary. But our mandate did not require the court to reconsider whether the consent was voluntary. Thus, we implicitly accepted its determination in Gorup I that the consent was voluntary. "Even if given voluntarily, however, consent does not validate a search that is ... not an independent act of free will sufficiently attenuated to break the chain of events between the Fourth Amendment violation and the consent."[21] That is, "[a]ttenuation analysis assumes that the statement is `voluntary' [under the Fifth Amendment] and asks whether the connection between the illegal police conduct and the statement nevertheless requires suppression to deter Fourth Amendment violations."[22]
To show that the taint of a previous Fourth Amendment violation was dissipated, the State must show a sufficient attenuation, or break in the causal connection, between the illegal conduct and the consent to search.[23] As we indicated in Gorup I, there are three relevant factors for determining whether a consent to search is sufficiently attenuated from a previous Fourth Amendment violation: (1) the temporal proximity between the illegal action and the consent to search, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct.

*28 TEMPORAL PROXIMITY WEIGHED IN FAVOR OF SUPPRESSION
In the court's suppression order, it found that no more than 10 minutes had elapsed from the time of the illegal entry until Gorup consented to a search of his apartment. It concluded that this factor favored exclusion.
The State argues that even this short of a period does not compel the conclusion that the attenuation was insufficient if other circumstances show that the consent was sufficiently an act of free will. Relying on U.S. v. Herrera-Gonzalez,[24] it argues that two relevant circumstances mitigated the short time between the illegal search and Gorup's consent to search: (1) Gorup did not know that the detectives had searched the black bag and found drugs; and (2) Simones informed Gorup of his right to refuse consent to search.
In Herrera-Gonzalez, a case involving an illegal traffic stop, the Eighth Circuit stated that it had "found consent given a short time after the [traffic] stop sufficient to purge the taint if other circumstances indicate the consent was sufficiently an act of free will."[25] There, the other circumstance was the officer's inability to verify the defendant's license plates or driver's license during the stop. This fact was a sufficient intervening circumstance that justified the officer's request to search and thus separated the defendant's consent from the delayed traffic stop, even if illegal. In other words, in some cases, the intervening circumstances factor may outweigh the temporal proximity factor. Whether there were intervening circumstances, however, is a separate issue from whether a suspect gave consent shortly after an illegal act. Assuming that there were valid intervening circumstances, permitting the State to play the same card twice  by considering the same facts as intervening circumstances and as mitigating circumstances under the temporal proximity factor  would always tip the weighing of the attenuation factors in its favor. Rather, each attenuation factor should be determined separately and then weighed together.
"[C]onsent [to search] given in very close temporal proximity to the official illegality is often a mere submission or resignation to police authority and not necessarily an act of free will."[26] "Dissipation of the taint resulting from an illegal entry, `ordinarily involves showing that there was some significant intervening time, space, or event.'"[27] So, "`[i]f only a short period of time has passed, a court is more likely to consider the consent [to search] as a "poisonous fruit" of the illegal act.'"[28] We conclude that the court correctly determined that this factor weighed in favor of exclusion.

INTERVENING CIRCUMSTANCES
The court concluded that the intervening circumstances factor weighed against exclusion. It apparently considered Gorup's lack of actual knowledge that Simones had found the contraband to be a unique, additional factor. Also, it relied on Simones' later advisements that Gorup could refuse consent for a search as a sufficient intervening circumstance.
*29 The State argues that these facts are intervening circumstances that distinguish this case from our decision in State v. Abdouch.[29] We disagree. By relying on these consent advisements and Gorup's lack of actual knowledge as a "unique factor," the court has incorrectly placed its thumb on the scale against exclusion. It is hardly unique that officers who have illegally entered a suspect's residence in his presence would not need to show him the contraband they found for the suspect to conclude that refusing to consent to search was pointless.
In Abdouch, sheriff's officers and relatives of a deceased man with whom the defendant had resided before his death unlawfully searched the defendant's residence while she was gone. The search uncovered evidence of marijuana cultivation. When the defendant returned, officers lawfully arrested her on a driving under the influence warrant and took her to jail. She did not witness the illegal entry. But 5 hours later, while in custody, narcotics officers confronted the defendant with the contraband and other evidence found at her residence, and she admitted her involvement in the marijuana production.
The district court suppressed all evidence found by the officers without a warrant, which action the State did not contest. But the court admitted the evidence found by the family members and admitted the defendant's custodial statements. We reversed. In concluding that Miranda warnings were insufficient to break the causal chain between the illegal search and the confession statement, we quoted extensively from Professor LaFave's treatise:
"In the typical case in which the defendant was present when incriminating evidence was found in an illegal search or in which the defendant was confronted by the police with evidence they had illegally seized, it is apparent that there has been an `exploitation of that illegality' when the police subsequently question the defendant about that evidence or the crime to which it relates. This is because `the realization that the "cat is out of the bag" plays a significant role in encouraging the suspect to speak.'
"Because this is the case, the more fine-tuned assessment which the Supreme Court mandated in Brown v. Illinois for determination of when a confession is the fruit of an illegal arrest, is ordinarily unnecessary when the `poisonous tree' is instead an illegal search.... `Confronting a suspect with illegally seized evidence tends to induce a confession by demonstrating the futility of remaining silent. On the other hand, the custodial environment resulting from a false arrest is merely one factor to be considered in determining whether a confession is inadmissible.' ...
"... [I]t is crystal clear that giving the defendant the Miranda warnings will not break the causal chain between an illegal search and a subsequent confession. The Court in Brown found the warnings alone insufficient when the primary illegality was an illegal arrest, and the warnings have even less impact when the prior Fourth Amendment violation was a fruitful illegal search."[30]
LaFave concludes that the same reasoning applies to consent searches after an illegal search. Regarding the coercive effcet *30 of knowing that an illegal search has already taken place, LaFave has stated:
Unquestionably, if evidence is uncovered in an illegal search and the defendant is "face to face with the incriminating evidence and able to see that the police had firm control over her home," a consent to police seizure of that evidence is not voluntary. The same is true if the police in the course of an illegal search find certain incriminating evidence and then obtain the permission of the person in charge of the place searched to search the balance of that place. The purported consent given in such circumstances is nothing more than "submission or resignation to police authority," for the individual most likely "erroneously believed that it was useless to resist."[31]
Under these facts, it is irrelevant that Simones did not confront Gorup with the contraband that he had seized or that Gorup did not see the actual search or seizure. He knew that the detectives had illegally entered his apartment and would have reasonably inferred that they had searched it. And other courts have similarly concluded that subsequent consents to search were tainted when the suspects observed law enforcement officers illegally enter their residence or vehicle without their consent or a warrant and would have reasonably concluded that refusing consent was pointless because the officers had already discovered the contraband.[32]
The suspects in these cited cases had not seen the officers discover or seize incriminating evidence, and the dissent does not contend otherwise. Instead, the dissent disagrees with our analysis because in many attenuation cases cited by LaFave, the suspects had seen law enforcement officers seize the evidence or the officers had told the suspects that they had found the evidence.[33] But that is not the fact pattern here.
Fourth Amendment cases are fact specific. The dissent's generalization misses the point. Relying on cases in which the suspects observed officers seize contraband or learned of the discovery from the officers does not show that the taint of the illegal action is purged unless those facts are present. The federal cases we have cited are on target. They illustrate illegal entry circumstances in which evidence was excluded without any requirement that the suspect have actual knowledge of the officers' discovery or seizure of the evidence. And the dissent relies on no case with similar facts in which a court held that the taint of a prior illegality was purged because the defendants did not see the officers seize incriminating evidence or because they had not been confronted with discovery of the evidence.
In U.S. v. Furrow,[34] one of the cases cited above, officers went to a cabin where they suspected a teenage party was underway. Several teenagers, including the cabin owner's son, ran off into the woods upon the officers' approach. After getting the remaining attendees to come out onto the porch, the officers attempted to obtain a search warrant from the county prosecuting attorney based on their observation of *31 underage minors drinking alcohol and their discovery of marijuana in the possession of one or two of the teenagers. The prosecuting attorney informed the officers that they did not have sufficient information for a warrant but suggested that they could conduct a protective sweep of the residence. Two officers entered the house and found marijuana pipes but no other incriminating evidence. At this point, the owner's son returned and consented to a further search. But it was unclear whether the son could have seen the officers' search from where he was previously hiding or had learned from his friends when he returned that the officers had been inside the cabin.
In remanding for the trial court to determine whether the son "was cognizant of the prior illegal entry,"[35] the Ninth Circuit commented on the effect of a suspect's knowledge of an illegal entry:
In Howard[36] and Suarez,[37] for example, the party who offered consent to a search had witnessed the illegal entry. The consent, although perhaps voluntary, was a product of the antecedent constitutional violation. In such a case, a person might reasonably think that refusing to consent to a search of his home when he knows that the police have, in fact, already conducted a search of his home, would be a bit like closing the barn door after the horse is out.... If a person was completely unaware of the illegal entry, his ability to consent would be unimpaired, and the taint would be effectively purged. A party unaware that the police might have already seen incriminating evidence would be in the same posture for considering whether to consent to a search as a person not previously subject to an illegal entry....
Thus, ... if [the owner's son] knew of the prior search, his consent may be considered tainted, and evidence found must be suppressed if [his] consent was a product of the initial illegal search. If, however, [the son], who was hiding during the time of the initial search, was oblivious to the fact of any earlier search at the time he gave his consent to the second search, then the consent cannot be considered tainted.[38]
But Gorup was not oblivious. He was aware of the illegal entry. Although Gorup was validly arrested, while he was handcuffed outside the door, Simones conducted an illegal search of his apartment. As Gorup stood just outside his door, Simones was searching just inside the door. It seems inconsistent and implausible for the State to argue that Gorup had knowledge of and control over drugs just inside the threshold but no knowledge that Simones would easily discover the drugs. Even if he could not see Simones discover or seize the contraband, he would have reasonably believed that Simones had done so and that refusing to give his consent to search was pointless. A separation of less than 10 minutes from that illegality did not dissipate the exploitation inherent in Simones' request to search.
We conclude that the district court incorrectly relied on the fact that Gorup did not see, and the police did not confront him with, the evidence Simones discovered during his illegal search before Gorup gave his consent to search again. This was not an intervening circumstance. Accepting *32 this reasoning would permit officers to validate illegal searches and seizures by simply never confronting suspects with evidence they have illegally discovered or seized before obtaining their consent to search again. Our conclusion is not altered because Simones advised Gorup that he could refuse consent to search.
Both the Seventh Circuit and the Ninth Circuit have rejected the argument that a signed consent form, which advises suspects of their right to refuse consent, is a sufficient intervening circumstance to purge the taint of an illegal action when it is obtained shortly after the illegal action: "This would effectively eviscerate the exclusionary rule's goal of deterring police misconduct because it would give officers who recently violated a suspect's constitutional rights a chance to grant themselves a free pass by uttering a few magic words and encourage  rather than discourage  investigatory shortcuts."[39] And the Ninth Circuit further recognized that permitting such advisements to purge the taint of the prior illegal search would be contrary to the U.S. Supreme Court's rejection of an analogous argument in Brown v. Illinois.[40]
In Brown, the Court rejected the government's argument that Miranda warnings, standing alone, were per se sufficient to separate the defendant's subsequent confession from the taint of his illegal arrest.[41] In State v. Abdouch, this court similarly concluded that Miranda warnings were an insufficient intervening circumstance to separate a subsequent confession from the taint of an illegal search.[42] It is true that knowledge of the right to refuse consent is a factor in determining whether a suspect voluntarily consented to a search.[43] And we recognized that some courts have also considered such advisements as an intervening circumstance in attenuation determinations.[44] But if, under Brown, Miranda warnings, standing alone, are insufficient to break the causal chain between an illegal search or seizure and a subsequent confession, we conclude that the same reasoning should apply to consent advisements. Absent any other intervening circumstance, an officer's advisement, given shortly after a Fourth Amendment violation, that a suspect may refuse consent to a search does not weigh against exclusion, particularly when the other factors strongly favor exclusion.[45] We conclude that the court erred in concluding that these facts presented a unique factor that weighed against exclusion.

PURPOSE AND FLAGRANCY OF THE OFFICIAL MISCONDUCT
The court concluded that this factor was neutral, weighing neither for nor against exclusion. It found that the detectives' purpose was "investigatory in design and that the search was executed in the hope that contraband would be found." But it concluded that it could not "find that search incident to arrest was an obvious violation of [Gorup's] constitutional rights." It further stated that it could not "find that [the detectives] recognized that such an intrusion was, on its face, unconstitutional."
*33 The State argues that the detectives, while mistaken in their belief that their conduct was legal, did not engage in flagrant misconduct. But the State fails to recognize that flagrant misconduct includes investigatory conduct that results in an obvious Fourth Amendment violation.
We agree with federal courts that have stated the purpose and flagrancy of the official misconduct is the most important attenuation factor because it is directly tied to the exclusionary rule's purpose  deterring police misconduct.[46] In applying this factor in Brown, the U.S. Supreme Court stated:
The illegality here ... had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was "for investigation" or for "questioning." ... The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which [the petitioner's] arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion.[47]
The Eighth Circuit has stated, consistent with the above quote from Brown, that purposeful and flagrant conduct can be found when "`(1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed "in the hope that something might turn up."'"[48] We agree with this standard. Other courts have also stated that purposeful and flagrant conduct includes "fishing expeditions" in the hope that "`something might turn up.'"[49]
In this case, the court's reliance on whether the detectives knew their conduct was illegal missed the mark because it applied a subjective standard. Obviously, if the detectives had admitted that they knew the search was illegal, their misconduct would have been flagrant. But, here, the detectives were never asked whether they subjectively believed the search was legal. And even if law enforcement officers do not subjectively know that their conduct is illegal, they are also chargeable with knowing when their conduct is an obvious violation of the Fourth Amendment under an objective standard of reasonableness.[50]
This court has specifically stated that in evaluating the reasonableness of a search or seizure without a warrant, "it is imperative that the facts be judged against an objective standard. Would the facts available to the officer at the moment of the search or the seizure warrant a man of reasonable caution in the belief that the action taken was appropriate?"[51] Grounding *34 the exceptions to the warrant requirement in objective reasonableness "`retains the value of the exclusionary rule as an incentive for [members of] the law enforcement profession as a whole to conduct themselves in accord with the Fourth Amendment.'"[52]
The issue here was whether an objectively reasonable law enforcement officer would have known that a search of Gorup's apartment under these circumstances was an obvious violation of the Fourth Amendment. But the court did not apply an objective reasonableness standard. And, because of the extensive case law on this issue, the district court was in no better position to determine this issue than is this court. We owe no deference to its conclusion.[53] "Objective reasonableness" cannot turn on different trial judges' individual determinations about whether the facts are sufficient or insufficient to justify a law enforcement officer's conduct. Avoiding such varied results and setting clear precedent for law enforcement officers to follow are the reasons for de novo review in Fourth Amendment cases.[54] So it is our duty to maintain coherent Fourth Amendment principles and determine whether the detectives' actions were objectively reasonable or unreasonable.
Our adherence to solid legal moorings requires that we reverse the trial court's ruling. For 40 years, U.S. Supreme Court case law has prohibited this type of search. In 1969, the U.S. Supreme Court held in Chimel v. California[55] that a search incident to arrest is limited to the arrestee's person and the area within his or her immediate control. The following year, the Court specifically held that a warrantless search of a house was invalid as a search incident to an arrest when the defendant was arrested on the front steps of his house.[56] We applied both of these decisions in a 1982 case to conclude that a warrantless search of a house was illegal.[57] Many courts have long held that an arrest must take place within a suspect's residence to justify the search of the residence as an incident to the arrest, even in cases preceding Chimel.[58]
Under an objective reasonableness standard, it should have been obvious to the detectives that after they had arrested Gorup outside the door to his apartment, they were required to have a search warrant before attempting to conduct a search within the apartment.
Moreover, the search suggested a quality of purposefulness, which was shown by the detectives' inconsistent testimony. Simones testified that the narcotics unit officers regularly arrested people with outstanding warrants without having a uniformed officer or patrol car present. Yet, he also testified that the detectives did not immediately transport Gorup to the police station house because they were waiting for a uniformed officer in a patrol car to assist them.
*35 In contrast, Stuck testified that while Simones was entering the apartment, Stuck and the uniformed officer were handcuffing Gorup and that the officer had a patrol car parked just outside the apartment building. The record does not support a finding that the officers could not have transported Gorup to the station if that had been their intent. And despite Simones' statement that they had intended to conduct a knock-and-talk and gain Gorup's consent to search, both Simones and Stuck admitted that they did not ask for Gorup's consent to search before arresting him and conducting a "protective sweep" and "search incident to arrest."
Obviously, the detectives did not have probable cause sufficient to support a search warrant at this point, and the State does not contend otherwise. Most tellingly, Stuck knew that only 2 weeks earlier, an officer had gone to Gorup's apartment and asked for his consent to search the apartment and that Gorup had refused to permit a search. This record compels the conclusion that (1) the detectives intended to conduct a protective sweep or a search incident to arrest, rather than a knock-and-talk investigation that had already failed; and (2) despite the obviousness of the search's illegality, the detectives exploited their search to obtain Gorup's consent after the fact.
In sum, none of the attenuation factors show that the causal chain between the detectives' illegal conduct and Gorup's consent to search was broken. Further, suppressing the evidence here would serve the deterrence aim of the exclusionary rule. Investigatory shortcuts cannot justify Fourth Amendment violations.[59] We will not uphold the admission of evidence that encourages Fourth Amendment violations. To ignore this violation would be setting a low bar for future police conduct.

CONCLUSION
We conclude that the court erred in failing to determine that the detectives obtained Gorup's consent to search his apartment by exploiting their previous illegal search of the same area. Because the second search was not attenuated from the Fourth Amendment violation, the court erred in failing to exclude evidence obtained in the search under Gorup's consent as the fruit of the poisonous tree. Accordingly, we reverse, and remand for a new trial.
REVERSED AND REMANDED FOR A NEW TRIAL.
STEPHAN, J., dissenting.
I respectfully dissent. While I agree with the analytical framework utilized by the majority, application of that framework to the facts of this case leads me to a different result.
The attenuation analysis flows from the following statement in the seminal case of Wong Sun v. United States[1]:
We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."
Here, the question is whether the detectives exploited their brief but illegal search of Gorup's apartment in order to obtain his consent to search. As we noted in our *36 prior opinion,[2] to resolve this question, the three-part test identified in Brown v. Illinois,[3] should be considered. But we also noted that all relevant facts should be considered, as the purpose of the analysis is "to determine whether under all the circumstances presented, the consent was obtained by exploitation of the prior illegal search."[4]
I agree with the majority's determination that we review the district court's findings of fact for clear error. Here, the district court found that at the time he gave his consent, Gorup knew only that the detectives had been in his apartment for 2 minutes. The court found that Gorup "never saw nor was ever confronted" with the contraband discovered during that brief entry and "was not aware" of any discovered contraband prior to giving his consent to search.
The majority assumes on these facts that Gorup consented only because he realized that resistance was futile. In support of this assumption, the majority cites Professor LaFave's treatise for the proposition that "knowing that an illegal search has already taken place" has a coercive effect on a party's consent to search.[5] But cases cited by LaFave in support of this proposition involve facts very different from those before us here. In those cases, the person giving the consent was aware of both the prior illegal search and the incriminating evidence that search had yielded.
For example, in People v. Clark Memorial Home,[6] a representative of a service club knew that police officers had entered the club and had seen illegal bingo equipment materials before the representative consented to a search which produced illegal slot machines. In U.S. v. Thomas,[7] the occupant of a hotel room knew that officers had entered the room and that they had found contraband before he consented to a search of the room which yielded additional contraband. In Norman v. State,[8] the defendant knew that a sheriff had entered his property and had seen marijuana stored in the defendant's barn before the defendant consented to a search of the premises. In State v. Hoven,[9] the defendant knew officers had partially searched his vehicle and found a bag of marijuana before he consented to a search of the vehicle. In State v. Olson,[10] the defendant knew that officers had already entered her home and found drugs and drug paraphernalia before she consented to a search of her home.[11] In each of these cases, one can logically conclude that because the individual knew that a prior entry had occurred and that the entry had *37 disclosed incriminating evidence, the subsequent consent was "nothing more than `submission or resignation to police authority,'" because "the individual most likely `erroneously believed that it was useless to resist.'"[12]
But the facts in this case are different, and as the majority notes, Fourth Amendment cases are fact specific. The district court found that all Gorup knew prior to giving his consent was that detectives were inside his apartment for 2 minutes. There is no evidence that he knew that a search was conducted during these 2 minutes or, even more importantly, that any evidence was discovered during these 2 minutes. The record shows that the incriminating evidence that was ultimately discovered was inside a bag and thus was not in the plain view of any officer or otherwise readily discoverable. Given these facts, I cannot logically conclude that Gorup consented to the search of his apartment only because he believed it was useless to resist.
And on these facts, the detective's repeated advisements that Gorup was not required to consent to the search carries additional significance in that it reinforced the fact that Gorup had real choice. Gorup did not testify at the suppression hearing, and there is nothing in this record from which I can conclude that at the time those warnings were given, Gorup knew or reasonably could have believed that consent would be futile because the detectives had already found the incriminating evidence which had been concealed in the bag in his apartment. Therefore, I would affirm the judgment of the district court.
HEAVICAN, C.J., joins in this dissent.
NOTES
[1] State v. Gorup, 275 Neb. 280, 745 N.W.2d 912 (2008).
[2] Id. at 282-84, 745 N.W.2d at 914-15.
[3] See Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).
[4] See, e.g., U.S. v. Valentine, 539 F.3d 88 (2d Cir.2008).
[5] See Gorup I, supra note 1.
[6] U.S. v. Robeles-Ortega, 348 F.3d 679 (7th Cir.2003).
[7] State v. Lane, 726 N.W.2d 371 (Iowa 2007).
[8] Gorup I, supra note 1, 275 Neb. at 285, 745 N.W.2d at 916.
[9] See, e.g., U.S. v. Valencia, 913 F.2d 378 (7th Cir.1990).
[10] Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), quoting Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).
[11] See Brown, supra note 3. See, also, 4 Wayne R. LaFave, Search and Seizure, a Treatise on the Fourth Amendment § 8.2(d) (4th ed. 2004).
[12] U.S. v. Hernandez, 279 F.3d 302 (5th Cir. 2002); Robeles-Ortega, supra note 6; U.S. v. Barnum, 564 F.3d 964 (8th Cir.2009); U.S. v. Melendez-Garcia, 28 F.3d 1046 (10th Cir. 1994); U.S. v. Santa, 236 F.3d 662 (11th Cir.2000). See, also, 4 LaFave, supra note 11.
[13] See Brown, supra note 3.
[14] See, State v. Scheffert, 279 Neb. 479, 778 N.W.2d 733 (2010); State v. Hedgcock, 277 Neb. 805, 765 N.W.2d 469 (2009).
[15] Hedgcock, supra note 14.
[16] Compare State v. Rogers, 277 Neb. 37, 760 N.W.2d 35 (2009).
[17] See Robeles-Ortega, supra note 6.
[18] See, e.g., U.S. v. Carter, 573 F.3d 418 (7th Cir.2009); U.S. v. Herrera-Gonzalez, 474 F.3d 1105 (8th Cir.2007); U.S. v. Washington, 387 F.3d 1060 (9th Cir.2004); People v. Wilberton, 348 Ill.App.3d 82, 809 N.E.2d 745, 284 Ill. Dec. 179 (2004); Turner v. State, 12 So.3d 1 (Miss.App.2008).
[19] State v. Wenke, 276 Neb. 901, 758 N.W.2d 405 (2008).
[20] Gorup I, supra note 1.
[21] See, e.g., U.S. v. Jaquez, 421 F.3d 338, 342 (5th Cir.2005).
[22] New York v. Harris, 495 U.S. 14, 23, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990).
[23] See, e.g., Jaquez, supra note 21.
[24] See Herrera-Gonzalez, supra note 18.
[25] Id. at 1112 (emphasis supplied).
[26] State v. Cates, 202 Conn. 615, 622, 522 A.2d 788, 792 (1987).
[27] U.S. v. Buchanan, 904 F.2d 349, 356 (6th Cir. 1990) (citation omitted).
[28] U.S. v. Lopez-Garcia, 565 F.3d 1306, 1315 (11th Cir.2009).
[29] State v. Abdouch, 230 Neb. 929, 434 N.W.2d 317 (1989).
[30] Id. at 945-46, 434 N.W.2d at 327-28, quoting 4 Wayne R. LaFave, Search and Seizure, a Treatise on the Fourth Amendment § 11.4(c) (2d ed. 1987) (citation omitted).
[31] 4 LaFave, supra note 11, § 8.2(d) at 85.
[32] See, e.g., U.S. v. Vega, 221 F.3d 789 (5th Cir.2000); U.S. v. Haynes, 301 F.3d 669 (6th Cir.2002); U.S. v. Furrow, 229 F.3d 805 (9th Cir.2000), overruled on other grounds, U.S. v. Johnson, 256 F.3d 895 (9th Cir.2001).
[33] See, U.S. v. Thomas, 955 F.2d 207 (4th Cir.1992); Norman v. State, 379 So.2d 643 (Fla.1980); People v. Clark Memorial Home, 114 Ill.App.2d 249, 252 N.E.2d 546 (1969); State v. Hoven, 269 N.W.2d 849 (Minn. 1978); State v. Olson, 311 Mont. 270, 55 P.3d 935 (2002).
[34] Furrow, supra note 32.
[35] Furrow, supra note 32, 229 F.3d at 815.
[36] U.S. v. Howard, 828 F.2d 552 (9th Cir. 1987).
[37] U.S. v. Suarez, 902 F.2d 1466 (9th Cir. 1990).
[38] Furrow, supra note 32, 229 F.3d at 814 (emphasis supplied).
[39] Washington, supra note 18, 387 F.3d at 1074. Accord Robeles-Ortega, supra note 6.
[40] See Brown, supra note 3.
[41] Id.
[42] See Abdouch, supra note 29.
[43] See Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).
[44] See 4 LaFave, supra note 11 (citing cases).
[45] See Robeles-Ortega, supra note 6.
[46] U.S. v. Reed, 349 F.3d 457 (7th Cir.2003); U.S. v. Simpson, 439 F.3d 490 (8th Cir.2006).
[47] Brown, supra note 3, 422 U.S. at 605, 95 S.Ct. 2254.
[48] See Herrera-Gonzalez, supra note 18, 474 F.3d at 1113 (emphasis supplied).
[49] See Reed, supra note 46, 349 F.3d at 465. Accord, Washington, supra note 18; U.S. v. McSwain, 29 F.3d 558 (10th Cir.1994).
[50] See, United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).
[51] State v. Nichols, 189 Neb. 664, 665, 204 N.W.2d 376, 377-78 (1973).
[52] Leon, supra note 50, 468 U.S. at 919 n. 20, 104 S.Ct. 3405.
[53] See Ornelas v. United States, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).
[54] See id.
[55] Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).
[56] See Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970).
[57] See State v. Weible, 211 Neb. 174, 317 N.W.2d 920 (1982).
[58] See, e.g., Kirkpatrick v. Butler, 870 F.2d 276 (5th Cir.1989); Page v. United States, 282 F.2d 807 (8th Cir.1960); United States v. Goad, 426 F.2d 86 (10th Cir.1970); Annot., 19 A.L.R.3d 727 (1968).
[59] See, e.g., Brown, supra note 3; Washington, supra note 18.
[1] Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
[2] State v. Gorup, 275 Neb. 280, 745 N.W.2d 912 (2008).
[3] Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).
[4] State v. Gorup, supra note 2, 275 Neb. at 286, 745 N.W.2d at 917 (emphasis supplied).
[5] See 4 Wayne R. LaFave, Search and Seizure, a Treatise on the Fourth Amendment § 8.2(d) (4th ed. 2004).
[6] People v. Clark Memorial Home, 114 Ill. App.2d 249, 252 N.E.2d 546 (1969).
[7] U.S. v. Thomas, 955 F.2d 207 (4th Cir.1992).
[8] Norman v. State, 379 So.2d 643 (Fla.1980).
[9] State v. Hoven, 269 N.W.2d 849 (Minn. 1978).
[10] State v. Olson, 311 Mont. 270, 55 P.3d 935 (2002).
[11] See, also, U.S. v. Howard, 828 F.2d 552 (9th Cir.1987) (occupant of house observed armed officers search home for 30 minutes prior to consenting to search); Burton v. State, 204 P.3d 772 (Okla.Crim.App.2009) (occupant of house knew officers had entered home and had observed evidence prior to consenting to search).
[12] 4 LaFave, supra note 5, § 8.2(d) at 85.