IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

STATE V. FELDER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLANT,
V.
MYRON K. FELDER, APPELLEE.

Filed July 15, 2014.    No. A-13-1146.

Appeal from the District Court for Douglas County: MARLON A. POLK, Judge. Reversed and remanded for further proceedings.

Donald Kleine, Douglas County Attorney, Sean P. Lynch, and Molly B. Keane for appellant.

Thomas C. Riley, Douglas County Public Defender, and Matthew J. Miller for appellee.

IRWIN, Judge.

## I. INTRODUCTION

The State of Nebraska brings this appeal to one judge of this court, pursuant to Neb. Rev. Stat. § 29-824 ((Reissue 2008), alleging that the trial court erred in granting the motion to suppress made by appellee, Myron K. Felder. In granting Felder's motion to suppress, the trial court concluded the police exceeded the scope of Felder's verbal and written consent to police to search his hotel room.

For the reasons discussed below, I reverse the trial court's order and remand the matter for further proceedings.

## II. FACTUAL BACKGROUND

On the afternoon of March 19, 2013, two Omaha police officers were dispatched to the American Inn Hotel to investigate "suspicious activity." The officers met with and received information from Henry Reese, the head maintenance technician for the hotel. Reese told the officers that recently, during hotel remodeling, the facility had experienced break-ins and "someone had came [sic] in broke into some of the rooms and stole a bunch of items."

- 1 -

Reese also told the officers that a hotel guest, later identified as Felder, when checking into the hotel had asked questions about how he could access his room by a staircase, despite there being an elevator nearby. Reese told the police that the doors to the hotel stairwells were not accessible with a guest's key card, but instead had to be opened from the interior of the building. Reese had seen Felder and another individual using a "closed off staircase." Apparently this, in part, caused Reese to be concerned that "possibly there was some illegal activity going on, or they were looking to maybe bring in tools and break into more rooms."

The officers also spoke with the hotel manager, who indicated that the man Reese had mentioned was staying in room 242 and had registered under the name "Myron Felder." With this information, Officer Paul Hanson (one of the two officers) prepared an Omaha Police Department consent to search form. This consisted of writing in Felder's name, the hotel's address, and room 242 onto a preprinted form. The following is the pertinent language from the form, with the information handwritten by the officers noted by underscoring:

I, Felder, Myron, in control of the property at 9720 West Dodge Rd. Room #242 Omaha NE 68114 do hereby voluntarily authorize Hanson, Paul 1784 and Villwok, John 1630 or any officer of the OMAHA POLICE DEPARTMENT to search the residence, or other real estate, located at 9720 W. Dodge Rd. Room #242 Omaha NE 68114 which is owned/rented by: Felder, Myron.

After the officers prepared the form, they went to Felder's room at the hotel, room 242, and knocked on the door. A man, later identified as "David Roberts," opened the door to room 242, and Roberts was asked if Felder was in the room. Felder then appeared, coming from inside room 242 out into the hallway where the officers were standing. The conversation in the hallway with Felder was recounted at the suppression hearing. The following is the direct examination of Officer Hanson by the prosecutor regarding that conversation:

[Prosecutor:] When . . . Felder came to the door, what happened next?

[Officer Hanson:] Well, when the door was opened and we were speaking with him, I did notice an odor of marijuana appeared to be coming from the room.

Q. And did you then continue to speak with . . . Felder?

A. Yeah. I just explained to him -- I said, we're here on a 911 call. The staff called 911 because they were concerned that there is some suspicious or illegal activity going on in this room, so the -- the maintenance guy saw you coming from the opposite end of the stairwell carrying something up, some large object. They've had break-ins recently, and they're just concerned that something is gong [sic] on in here.

Q. Where was this conversation being held?

A. In the hallway right -- right in front of the room door.

Q. And who was present?

A. Myself and Officer Villwok and . . . Felder.

Q. After you explained what you just discussed, did you ask . . . Felder a question?

A. Yeah. He had stated that there wasn't anything illegal going on there. And I said, do you mind if we come in and search your room?

Q. Then what happened?

A. He said that's fine. Said you can search.

Q. And --

A. I don't remember the exact words, but he said sure.

Q. Was there any hesitation on his part to that response?

A. No.

Q. Did you provide him with the permission to search form that you had previously filled out?

A. Yeah. I had filled out a form, and I handed it to him. I said, well, this is -- this would be written permission. If you could just review this and sign it if, you know, that's okay.

Q. What happened then?

A. He grabbed the form, looked it over, and then signed on the consenting person box.

Although Felder denied having signed the consent to search form, the trial judge made a finding of fact that Felder had, in fact, voluntarily signed the form. For purposes of this appeal, there is no issue concerning whether Felder signed this consent form.

On cross-examination, counsel elicited the following additional testimony about the conversation preceding the signing of the general consent form:

Q. And do you recall if you mentioned to him you were looking for mini refrigerators or TVs?

A. I don't recall stating that I was looking for those items. I might have said that TVs have been stolen in the past. I don't recall if I told him that the technician had seen him carry something -- I know I said the technician had seen you carrying something large up, but I don't remember if I said mini fridge.

Q. But you do remember mentioning to him TVs and -- specifically?

A. Yes.

Although the trial judge's order seems to suggest otherwise, the parties both agree in their briefs on appeal that neither Officer Hanson nor Officer John Villwok entered the room before the permission to search form was signed. Once inside the room, officers noticed several items--a laptop, two printers, and a paper shredder. Both officers then testified that they smelled the odor of marijuana inside the room and began questioning the room occupants about the marijuana. One of the room occupants admitted that he had some marijuana on him, and the officers informed him that he would be given a ticket for the marijuana.

Officer Villwok then began looking around the room. Officer Villwok located a black "satchel" and a black folder/case in the room and searched them. As a result of the search of the satchel and the folder/case, evidence was uncovered that was consistent with a forgery operation. Various items of evidence were recovered by the police, and Felder was arrested.

A motion to suppress the evidence seized as a result of the hotel room search was filed. The trial court entered an order suppressing all evidence discovered during the search of Felder's hotel room, finding that the search had exceeded the scope of the consent to search granted by Felder. The judge concluded that the consent to search was limited in scope to places and closed

containers which could conceal a mini refrigerator (mini-fridge) or television (TV). This interlocutory appeal was then filed.

## III. ASSIGNMENT OF ERROR

The State contends, restated, that the district court erred in concluding Felder's consent to search his hotel room was limited in scope to places and closed containers that would conceal a mini-fridge or TV.

## IV. ANALYSIS

The discrete issue in this case is whether Felder's written and verbal consent to search his hotel room was exceeded by the police, in the context of the totality of circumstances set forth in the factual background section above. After conducting a de novo review of this legal question of whether there was a Fourth Amendment violation, I conclude that there was no such violation because the police did not exceed the scope of the consent to search.

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, the familiar two-part standard of review is applied. *State v. Matit*, 288 Neb. 163, 846 N.W.2d 232 (2014). The trial court's findings of historical facts are reviewed for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law reviewed independently of the trial court's determination. *Id.*

The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness--what would the typical reasonable person have understood by the exchange between the officers and the suspect? *State v. Howell*, 284 Neb. 559, 822 N.W.2d 391 (2012). The permissible scope of the search "is *not* to be determined on the basis of the subjective intentions of the consenting party or the subjective interpretation of the searching officer." *Id.* at 563, 822 N.W.2d at 396, quoting 4 Wayne R. LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 8.1(c) (4th ed. 2004) (emphasis in original).

A consensual search by its very definition is circumscribed by the extent of the permission given, as determined by the totality of the circumstances. *State v. Rathjen*, 16 Neb. App. 799, 751 N.W.2d 668 (2008), citing *State v. Wells*, 539 So. 2d 464 (Fla. 1989), *affirmed on other grounds* 495 U.S. 1, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990). Relevant considerations with respect to the scope of a consent include any express or implied limitations regarding the time, duration, area, or intensity of the police activity necessary to accomplish the stated purpose of the search, as well as the expressed object of the search. See 68 Am. Jur. 2d Searches and Seizures § 271 (2014). Put simply, consent, and its scope, are contextual.

In addition to the verbal and written consents to search that Felder gave the officers, the hallway conversation that took place between the officers and Felder is relevant:

> [Prosecutor:] And did you then continue to speak with . . . Felder?
> [Officer Hanson:] Yeah. I just explained to him -- I said, we're here on a 911 call. The staff called 911 because they were concerned that there is some suspicious or illegal activity going on in this room, so the -- the maintenance guy saw you coming from the opposite end of the stairwell carrying something up, some large object. They've had break-ins recently, and they're just concerned that something is gong [sic] on in here.
> Q. Where was this conversation being held?

A. In the hallway right -- right in front of the room door.

Q. And who was present?

A. Myself and Officer Villwok and . . . Felder.

Q. After you explained what you just discussed, did you ask . . . Felder a question?

A. Yeah. He had stated that there wasn't anything illegal going on there. And I said, do you mind if we come in and search your room?

Q. Then what happened?

A. He said that's fine. Said you can search.

Q. And --

A. I don't remember the exact words, but he said sure.

Q. Was there any hesitation on his part to that response?

A. No.

Q. Did you provide him with the permission to search form that you had previously filled out?

A. Yeah. I had filled out a form, and I handed it to him. I said, well, this is -- this would be written permission. If you could just review this and sign it if, you know, that's okay.

Q. What happened then?

A. He grabbed the form, looked it over, and then signed on the consenting person box.

In addition, although it is unclear from the record precisely what the officers may have said to Felder about stolen mini-fridges and/or TV's, the trial judge concluded that stolen mini-fridges and/or TV's were part of the conversation between the officers and Felder that took place in the hallway before the consent and search. Understanding that the trial judge is the arbiter of disputed facts, absent clear error, the totality of circumstances for purposes of my review includes the trial judge's conclusion that this was part of the conversation.

Nebraska jurisprudence recognizes that a person who gives police his consent to search may also limit the scope of that consent. See *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996) (consent may be withdrawn or limited at any time prior to completion of search). Likewise, a consenting party may demonstrate an intent to limit consent for a search by objecting when the search exceeds what he later claims was a more limited consent. See *State v. Howell*, 284 Neb. 559, 822 N.W.2d 391 (2012). The plain language of the written consent to search form involved in this case contains no limitations, by way of either interlineation or preprinted options to designate a limitation to the scope. The trial judge's order reflects no such limitations or objections to the scope of the search existed or occurred.

The trial judge ultimately concluded that all the evidence should be suppressed. Here is the salient language from his written order:

In the instant case, the record is clear that the officers were called to hotel as a result of thefts involving mini-fridges and television [sic] and the fact that [Felder] was allegedly seen carrying a big box the size of a mini-fridge or television up to his room. In fact, the officers informed the occupants of [Felder's] room they were there because there had

been recent thefts around the hotel. Thus, the circumstances presented to the officers were such that the consent given by [Felder] would limit the scope of their search of the hotel room to places, and closed containers, that would conceal a mini-fridge or television. That their search of the small bags depicted in Exhibits 4-6 would not contain such evidence and thus would [be] outside the scope of the consent obtained by [Felder].

The Nebraska Supreme Court has long held that in evaluating whether a particular warrantless search is a Fourth Amendment violation, "'it is imperative that the facts be judged against an objective standard'" of reasonableness. *State v. Gorup*, 279 Neb. 841, 863, 782 N.W.2d 16, 33 (2010), quoting *State v. Nichols*, 189 Neb. 664, 204 N.W.2d 376 (1973). "'Objective reasonableness' cannot turn on different trial judges' individual determinations about whether the facts are sufficient or insufficient to justify a law enforcement officer's conduct. Avoiding such varied results and setting clear precedent for law enforcement officers to follow are the reasons for de novo review in Fourth Amendment cases." *State v. Gorup*, 279 Neb. at 864, 782 N.W.2d at 34, quoting *Ornelas v. United States*, 517 U.S. 690, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996). The trial court's determination on this is due no deference from an appellate court. *State v. Gorup, supra.*

Under an objective reasonableness standard, the facts available to the officers at the moment of the search would warrant a man of reasonable caution in the belief that the search was not limited to places and closed containers that could conceal mini-fridges or TV's. A reasonably objective police officer would know that someone stealing TV's in a hotel building most likely would require "tools" to break into locked hotel rooms. It also would not be objectively unreasonable to imagine that, even once inside the room, "tools" may be needed to steal a TV that may be secured to the wall or another item of heavy furniture. It would not have been obvious to a reasonable officer that after a conversation with a suspect about hotel break-ins, thefts, and suspicious activity, a search warrant would be required before attempting to conduct a search within the apartment for anything other than mini-fridges and TV's specifically.

The investigation these officers were conducting, of a possible hotel break-in and theft operation, cannot be said to have been conducted objectively unreasonably when they searched spaces smaller than those where a mini-fridge or TV might be contained. It would seem axiomatic that a search relating to mini-fridges or TV's being stolen out of hotel rooms could include searching for a variety of possible tools that would be used to gain access to hotel rooms or other evidence of the thefts. Such a search could reasonably and objectively have been expected to include searching for hotel key cards or keys that did not belong to room 242 or its occupants, lock picks, Slim Jims, prying devices, or other devices for opening or decoding hotel room door locks. The objects of such a search could reasonably be expected to also include the accoutrement necessary to remove a secured TV, such as wire or cable cutters, wrenches, pliers, screwdrivers, hammers, and other common handtools. Such a search might also reasonably include items such as masks, gloves, and other clothing used to hide identity or fingerprints. And this listing is not intended to be exhaustive.

Some of the above suggested items could reasonably have been expected to be concealed in an item like the "satchel" or folders which were located and searched in this case.

The officers were within the scope of the consent granted when they looked for and noticed objects, both large and small, when applying an objectively reasonable standard and

recognizing that there was no limitation to the scope of the search identified on the consent to search form or through Felder's statements or actions. The context of the hallway conversation mentioning mini-fridges and/or TV's does not change that conclusion.

The police committed no Fourth Amendment violation because under an objective reasonableness standard they did not exceed the scope of this consensual search. The trial judge erred in finding otherwise.

V. CONCLUSION

For the reasons explained above, the trial court's order is reversed and the matter is remanded for further proceedings.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.