Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/12/2016 09:05 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
SHANNON K. BOND, APPELLANT.
___ N.W.2d ___

Filed April 12, 2016.    No. A-15-478.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

3. **Constitutional Law: Search and Seizure.** It is well settled under the Fourth Amendment that warrantless searches and seizures are per se unreasonable, subject to a few specifically established and well-delineated exceptions.

4. **____: ____.** A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.

5. **Police Officers and Sheriffs: Search and Seizure.** In addition to situations where an officer directly tells a suspect that he or she is not free to go, circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

6. **Search and Seizure: Duress.** Consent to search must be voluntarily given and not the result of duress or coercion, whether express, implied, physical, or psychological.

7. ____ : ____. In examining all the surrounding circumstances to determine if in fact a consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.

8. **Search and Seizure.** Where both occupants of a jointly occupied premises are physically present, the consent of one occupant to a search is insufficient when the other occupant objects to the search.

9. ____. The determination of whether consent to search is voluntarily given is a question of fact to be determined from the totality of the circumstances.

10. **Search and Seizure: Proof.** The burden is upon the government to prove that a consent to search was voluntarily given.

11. **Sentences: Probation and Parole.** When a court sentences a defendant to probation, it may impose any conditions of probation that are authorized by statute.

Appeal from the District Court for Hall County: William T. Wright, Judge. Affirmed.

Vicky A. Kenney and Matthew A. Works, Deputy Hall County Public Defenders, for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Moore, Chief Judge, and Inbody and Bishop, Judges.

Bishop, Judge.

Following a bench trial in the district court for Hall County, Shannon K. Bond was convicted of possession of a controlled substance (methamphetamine), a Class IV felony, see Neb. Rev. Stat. § 28-416(3) (Cum. Supp. 2014), and sentenced to 4 years' probation. She appeals, contending the district court erred in failing to suppress evidence seized during an allegedly unconstitutional search of her apartment. She argues that without the evidence, there was insufficient evidence to establish her guilt. She also contends the district court improperly imposed a term of probation prohibiting her from having any contact with her boyfriend, Paul J. Turner, who was convicted

of drug-related offenses in a consolidated trial with Bond. We affirm.

## BACKGROUND

On January 21, 2014, Bond was charged by information in the district court for Hall County with possession of methamphetamine. In a separate information filed in the district court for Hall County on the same date, Turner was charged with possession of methamphetamine, possession of drug paraphernalia, and possession of 1 ounce or less of marijuana. Bond's and Turner's offenses allegedly occurred on December 3, 2013, in Hall County, Nebraska.

On May 28, 2014, Bond filed a motion to suppress evidence seized during an allegedly unconstitutional search of the apartment she shared with Turner. She further requested that any statements she made be suppressed, alleging the statements were not freely and voluntarily made. On May 14, Turner had filed a nearly identical motion to suppress in his case.

Bond and Turner, both of whom were represented by counsel, agreed to a consolidated evidentiary hearing on their motions to suppress; the hearing was held on July 17, 2014. Investigator Sarah Mann of the Grand Island Police Department testified as follows: On December 2, 2013, she went to an address on North Walnut Street in Grand Island, Nebraska, in response to a child abuse hotline intake indicating possible drug use in front of minor children at the address. Upon arriving, she knocked on the door and heard no response. She returned around 1 p.m. the next day, December 3, with Chelsea Willden, an employee of the Nebraska Department of Health and Human Services (DHHS). Investigator Mann realized the door on which she had knocked the prior day led to a staircase, and she opened the door and ascended the stairs. At the top of the stairs was the door to an apartment. She knocked on the door and heard a male voice say, "Come in." She continued knocking, and Turner opened the door.

According to Investigator Mann, she identified herself and Willden, explained they had received a complaint, and asked if they could "come in and chat with him about it." Turner said yes and invited them inside. Mann and Willden talked to Turner about the allegations, and then Bond exited a bedroom and joined the conversation. Mann and Willden explained the allegations to Bond. At some point during this interaction, Investigator Mann saw an individual whom she identified as Dennis Castro sitting in the living room; she learned that Castro had a warrant for his arrest and requested a patrol unit to transport Castro to the jail. Waiting for the patrol unit "took up some time."

After Castro was transported away, Royal Kottwitz, another investigator with the Grand Island Police Department, noticed a backpack on the living room floor. (On cross-examination, Mann clarified that Investigator Kottwitz was with her and Willden when they arrived at the apartment on December 3, 2013.) Neither Bond nor Turner knew who owned the backpack, and both agreed it could be searched. Upon opening the backpack, Investigator Mann located among other items a hypodermic needle, a small baggie of what appeared to be marijuana, and a glass pipe with white residue. Based on her training and experience, Investigator Mann believed the glass pipe was a "meth pipe."

Investigator Mann explained that after finding the items in the backpack, there was a discussion about consent to search the apartment. Bond wanted to give consent, but Turner did not. There was a discussion "amongst officers" about whether to seek a search warrant. Bond then asked if she could go to the bathroom and asked Investigator Mann to accompany her. In the bathroom, Bond "was pretty worked up" and told Investigator Mann she would give up "everything" and "wanted to know if that would kind of make all this go away." Investigator Mann told Bond she could not answer that question because she did not know what Bond had. The two women left the bathroom, and Bond led Investigator Mann into the

bedroom, where Bond pulled two pipes and a baggie out of her purse. Bond handed the pipes to Investigator Mann and said, "This is my marijuana pipe," and, "This is my meth pipe." The baggie had a white residue that appeared to be methamphetamine.

After Bond handed the items to her, Investigator Mann told Bond she still wanted to search the apartment. They returned to the living room, and Bond conversed with Turner. According to Investigator Mann, Bond and Turner could not agree whether to give consent and "kind of went back and forth." Every now and then, Investigator Mann would tell them "time's ticking" and ask for a decision. Eventually, Investigator Mann informed Bond and Turner she was leaving to apply for a search warrant, but Bond asked her to wait. After Bond and Turner still could not reach a decision, Investigator Mann said "time's up" and left to seek a search warrant.

Investigator Mann testified that Officer Wesley Tjaden arrived to "stand by to make sure no evidence was destroyed" while she sought a search warrant. Investigator Mann returned to the police department and had nearly completed her warrant application when Officer Tjaden called to inform her Bond and Turner had decided to consent to the search. Investigator Mann, who had not completed the warrant application, returned to the apartment, and Bond and Turner verbally consented to a search and signed consent-to-search forms. The forms were received into evidence; Bond signed her form at 4:05 p.m., and Turner signed his form at 4:10 p.m.

During the subsequent search of the apartment, Investigator Mann located a makeup or cosmetic bag containing drug paraphernalia and what she believed to be methamphetamine. The bag was located in a magazine rack in the master bedroom, on the side of the bed that Bond indicated was hers. In the nightstand on the other side of the bed, Investigator Kottwitz located a glass marijuana pipe, a marijuana grinder, two broken glass pipes, and a "blue pencil torch." Other drug-related items were located in other places in the master bedroom,

including a baggie containing a white crystalline substance on the desk and folded up tinfoil with white residue in the trash can.

Investigator Mann testified that after locating the items during the search, she gave Turner warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and that he signed a form waiving his rights. The form was received into evidence and indicated Turner signed the form at 5:15 p.m. When Investigator Mann then asked Turner if the items in the magazine rack were his, Bond spoke up and said they were hers. Investigator Mann placed Bond and Turner under arrest.

On cross-examination, Investigator Mann testified that prior to going to Bond and Turner's apartment, she and Willden interviewed Turner's 10- and 11-year-old sons at their schools. Neither boy reported witnessing drug use at home. Investigator Mann also spoke with the boys' mother (who was not Bond), and the mother expressed concern that Bond and Turner were "currently using." The mother, who had custody of the boys, did not know what occurred during the boys' visits with Turner.

Also on cross-examination, Investigator Mann explained that the door on which she knocked on December 2, 2013, was "an outside door off the sidewalk of the business district" in Grand Island. Although she did not recall there being a doorbell, she was shown her police report in which she reported that she rang a doorbell next to the outside door. When she returned on December 3, she realized that because the apartment was in a business district, the door must lead to a staircase to the upstairs apartment. When she opened the door, she saw an enclosed staircase leading to another door. The stairs did not appear to be the interior of someone's home. She did not recall seeing any personal belongings on the stairs.

Investigator Mann also explained that when she discussed the allegations of the hotline report with Bond and Turner, they showed her the children's sleeping area and Bond and Turner's

food supply in the kitchen. Nothing Investigator Mann saw caused her concern over the children's care.

Still on cross-examination, Investigator Mann estimated that when Bond and Turner were discussing whether to consent to a search of the apartment, she inquired three to four times as to whether they had made a decision.

Officer Tjaden testified that on December 3, 2013, he was called to an apartment on North Walnut Street in Grand Island to arrest Castro and transport him to jail. After he transported Castro, he returned to the apartment to "stand at the residence" while Investigator Mann obtained a search warrant. After Investigator Mann left, the only persons in the apartment were Officer Tjaden, Bond, and Turner. Officer Tjaden stood in the doorway of the living room, and Bond and Turner sat on the couch in the living room. Neither Bond nor Turner asked or attempted to leave, and the officer did not tell them they were not free to do so. Officer Tjaden observed Bond "begging and pleading" with Turner to give consent to search the apartment. The officer never discussed the subject of consent to search with them. At some point, Bond and Turner told the officer they had decided to give consent to search. He radioed Investigator Mann to return to the apartment. Officer Tjaden estimated he was at the apartment for 45 minutes to 1 hour during the time Investigator Mann was preparing her search warrant application.

On cross-examination, Officer Tjaden recalled seeing "stuff lined up on either side of the stairwell," but he did not remember what it was. He also testified he was 6 feet 3 inches tall and weighed close to 260 pounds. While in the apartment, he was in full uniform with his service weapon displayed on his person.

The State rested, and Bond and Turner called Willden as their first witness. Willden's testimony concerning the events of December 2 and 3, 2013, was largely consistent with Investigator Mann's testimony. However, she testified that Bond answered the apartment door, not Turner as Investigator

Mann testified. Willden testified that following the visit to the apartment, DHHS closed the investigation into the hotline report as "unfounded."

Bond and Turner next called Investigator Kottwitz. He testified that when he arrived at the apartment with Investigator Mann and Willden on December 3, 2013, they were unsure whether the street-level door "led to the residence or led to multiple apartments on the second level." Investigator Kottwitz testified he opened the unlocked door and saw a stairway leading to a second door. He recalled seeing "minimal property" on the stairs. The remainder of his testimony was consistent with Investigator Mann's testimony.

On August 14, 2014, the court entered a written order overruling Bond's and Turner's motions to suppress. The court found that when the investigators and Willden approached the apartment for purposes of inquiring about the hotline report, they were engaging in a "'knock and talk'" and did not require a warrant. The court further found that while one might argue the stairway was part of the "'curtilage'" of the apartment, there was no indication Bond and Turner had a reasonable expectation of privacy in the stairway, and the evidence suggested it was expected for a visitor to climb the stairway and knock on the upstairs door. The court noted Turner's lack of surprise when Investigator Mann knocked on the upstairs door, given that Turner's response was "'come in.'"

Turning to the issue of consent to search, the court found that either Bond or Turner consented to the initial entry into the apartment. The court then found that Bond and Turner consented to the search of the backpack and that Bond invited Investigator Mann to the bathroom and bedroom, where Bond gave Investigator Mann drug paraphernalia and items with drug residue on them. Even though Turner had not consented to a search of the apartment at that time, the court noted that Turner was not the target of a search when Investigator Mann accompanied Bond to these areas and that Bond had "'common authority'" over the apartment.

Addressing the ultimate search of the entire apartment, the court found it to be the only "potentially problematic" search. The court noted Bond and Turner did not sign the consent-to-search forms until law enforcement officials had been in and out of the apartment for approximately 3 hours. This time period was prolonged due to Castro's arrest, the discussion between Bond and Turner regarding consenting to the search, and Investigator Mann's departure to seek a search warrant. The court found that "the vast majority of the time officers spent in the residence was the result of Bond's efforts to secure Turner's consent." Furthermore, the court found that "[i]f anyone overbore Turner's will, it was Bond, not the officers in question." The court upheld the consensual search of the apartment. The court also found that any statements made by Bond and Turner either were volunteered without custodial inquiry or followed the voluntary waiver of rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

At Bond and Turner's request, the matter proceeded to a consolidated bench trial on December 22, 2014. Investigators Mann and Kottwitz testified consistently with their testimony at the suppression hearing. In addition, a forensic scientist from the Nebraska State Patrol crime laboratory testified concerning her testing of the suspected drugs seized from the apartment, which tested positive for marijuana and methamphetamine. After an evidence technician provided testimony concerning the chain of custody, the drugs and drug paraphernalia seized from the apartment were received into evidence.

The court found Bond guilty of possession of methamphetamine and requested preparation of a presentence investigation report (PSR). At a sentencing hearing on May 6, 2015, the court stated it had reviewed the PSR, which indicated that in August 2008, Bond was convicted of delivery or possession with intent to deliver an exceptionally hazardous drug (drug not specified), a Class II felony, and was sentenced to 4 to 5 years' imprisonment; in 2007, she was convicted of

shoplifting; and in March 2004, she was arrested for possession of a controlled substance (drug not specified), but the charge was dismissed after she completed drug court. The PSR reflected that Bond scored at high risk for recidivism using the "Level of Service/Case Management Inventory"; moderate to high risk for alcohol or drug abuse using the "Simple Screening Instrument"; and in the "problem risk" range on the "Substance Abuse Questionnaire" in the areas of alcohol and drugs. A chemical dependency analysis was attached to the PSR; the counselor who completed the analysis recommended that Bond complete intensive outpatient treatment for substance abuse.

At the sentencing hearing, after Bond's counsel argued in favor of a term of probation, the court offered Bond an opportunity for allocution. After Bond began discussing the "things in this case that aren't right," the court interrupted, stating it was particularly concerned with Bond's substance abuse problem and wanted to know why it should not sentence her to prison. Bond said she would go to prison if the court felt "that's where [she] need[ed] to be." The court then asked some specific questions concerning Bond's substance abuse, including whether she was still living with Turner, who was a long-term drug addict. Bond indicated that Turner had recently moved out. She said she knew "it's what's best for [her]," apparently referring to distancing herself from Turner. She went on to explain that for "probably" the past year, Turner would "come and go" and "he slept in the front room" while Bond slept in the bedroom. Bond said "it was really not a relationship." The court indicated it did not believe Bond "would ever make it on probation" unless she had no contact with Turner. When the court asked Bond if she would be able to comply with a term of probation requiring her to have no contact with Turner, Bond responded, "It would be very hard"; she later said she "would have to" comply with such a provision, although she could not "shut off [her] feelings." The court indicated that the alternative to probation was

to sentence Bond to prison "with the hope" that she would receive treatment.

At the conclusion of the sentencing hearing, the court sentenced Bond to 4 years' probation. One of the terms was that Bond "[n]ot associate with individuals having a known criminal record," except by permission of the probation officer, or "any person in possession of non-prescribed controlled substances to include family and significant others and specifically . . . Turner." Bond's terms of probation also included that she serve 90 days in jail; complete intensive outpatient counseling; not consume alcohol or drugs; submit to chemical drug testing at the probation officer's request; serve an immediate 72-hour jail sanction for any positive drug test, curfew violation, or refusal to test; and complete a variety of classes.

Bond timely appealed to this court.

## ASSIGNMENTS OF ERROR

Bond assigns that (1) there was insufficient evidence to sustain her conviction, (2) the court erred in failing to suppress "prejudicial evidence of Bond's possession of a controlled substance after a prolonged search and seizure of her person and home," and (3) the court erred in prohibiting Bond from having contact with her "long term boyfriend, . . . Turner, during the pendency of her probation" because it is not reasonably related to her offense and is "an unlawful intrusion on her life."

Bond's only argument in support of her first assignment of error is that without the evidence seized during the search of the apartment, there was insufficient evidence to establish her guilt; she does not contend that the evidence, if properly admitted, was insufficient. Therefore, the success of Bond's first assignment of error hinges on her second assignment of error.

## STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment,

we apply a two-part standard of review. *State v. Wells*, 290 Neb. 186, 859 N.W.2d 316 (2015). Regarding historical facts, we review the trial court's findings for clear error. *Id*. But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination. *Id*.

[2] We will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Ortega*, 290 Neb. 172, 859 N.W.2d 305 (2015). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Rieger*, 286 Neb. 788, 839 N.W.2d 282 (2013).

## ANALYSIS

*Evidence Seized During*
*Search of Apartment.*

Bond challenges the search of her and Turner's apartment on a number of grounds. She contends that after Investigator Mann and Willden interviewed Turner's sons, they should have ceased their investigation into the hotline report of possible drug use in front of the children; she maintains law enforcement did not have probable cause to continue the investigation beyond that point. She further argues the investigators "without authorization entered what should be considered a porch area wherein they should not have entered without invitation." Brief for appellant at 16. She contends the 3-hour period during which law enforcement was in the apartment prior to obtaining consents to search was an unreasonable and "excessively long seizure and detention." *Id*. Bond asserts her and Turner's wills were overborne, resulting in coerced consents.

The State responds that Bond failed to preserve her objection to the evidence seized during the search. The State points out that after the district court overruled Bond's motion to

suppress, Bond failed to object to the admission of some of the drug evidence at trial. We note that Bond renewed her motion to suppress at trial and requested a continuing objection based on her motion to suppress. However, the district court would not allow a continuing objection and instructed Bond she needed to object to individual lines of testimony. The record is replete with objections; however, as the State points out, Bond failed to object to every single line of testimony concerning drug evidence seized from the apartment. We need not decide whether this was sufficient to preserve the issue for appeal, because, whether or not Bond preserved the issue, we conclude it was proper not to suppress the evidence seized from the apartment, as we now explain.

[3] It is well settled under the Fourth Amendment that warrantless searches and seizures are per se unreasonable, subject to a few specifically established and well-delineated exceptions. *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001). One well-recognized exception is a search undertaken with consent. *Wells, supra*. To be effective under the Fourth Amendment, consent must be voluntary; in other words, it must be a free and unconstrained choice, not the result of a will overborne. See *Tucker, supra*. In addition, where a consensual search follows an illegal entry, as Bond alleges occurred here, a court must determine whether the consent was an exploitation of the prior illegality. See *State v. Gorup*, 279 Neb. 841, 782 N.W.2d 16 (2010). The search will be upheld only if the State has shown a sufficient attenuation, or break in the causal connection, between the illegal conduct and the consent to search. See *id*. Because any illegality in the investigators' entry into the stairway or apartment will require us to address the issue of attenuation, we address the legality of the entries before addressing the voluntariness of the consents to search.

We begin with the entry into the stairway leading to the upstairs apartment door. The Nebraska Supreme Court has explained that the degree of privacy society is willing to

accord an apartment hallway depends on the facts, such as whether there is an outer door locked to the street which limits access, the number of residents using the hallway, the number of units in the apartment complex, and the presence or absence of no trespassing signage. *State v. Ortiz*, 257 Neb. 784, 600 N.W.2d 805 (1999). In this case, the upstairs apartment was located in a business district and the street-level door was unlocked. However, the street-level door led to one apartment only; thus, the stairway was not shared among multiple tenants. Bond suggests the enclosed stairway "should be considered a porch area" in which she and Turner had an expectation of privacy, brief for appellant at 16, and we see no reason not to accept her invitation to treat it as such for purposes of argument.

"The front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409, 1415, 185 L. Ed. 2d 495 (2013), quoting *Oliver v. United States*, 466 U.S. 170, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984). Although a front porch is therefore a constitutionally protected area, a police officer does not engage in an "unlicensed physical intrusion" by entering that area to knock on the front door. *Jardines*, 133 S. Ct. at 1415. See, also, *Kentucky v. King*, 563 U.S. 452, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011) (law enforcement officers not armed with warrant may knock on door, because they do no more than any private citizen might do). This is because a visitor, including a police officer, has an implicit license to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 133 S. Ct. at 1415. It is only when an officer exceeds the scope of that license, such as by using a trained police dog to search the front porch for incriminating evidence, that a Fourth Amendment violation occurs. See *Jardines, supra*.

When the investigators and Willden ascended the stairs and knocked on the apartment door with the hopes of speaking to

Bond and Turner about the hotline report, they did nothing to exceed the scope of their implicit license to approach the door and knock. Any doubt about this conclusion is resolved when one considers that Turner's reaction to the knocking was to say, "Come in," which suggests Turner was not alarmed to have visitors knocking on the upstairs door. Thus, even assuming arguendo the enclosed stairway was the equivalent of a porch area, as Bond suggests, no constitutional violation occurred. See *State v. Breuer*, 577 N.W.2d 41 (Iowa 1998) (holding that law enforcement officer without warrant did not unreasonably invade suspect's legitimate expectation of privacy by opening unlocked outer door of apartment building and proceeding up stairway to apartment door). Although Bond argues law enforcement did not have probable cause to investigate her and Turner after an interview of Turner's sons did not substantiate the hotline report, no probable cause is required for a "knock and talk" like the one that occurred here. See *King, supra* (when law enforcement officers not armed with warrant knock on door, they do no more than any private citizen might do; no Fourth Amendment violation occurs).

We next address the entry into the apartment itself. Generally, absent exigent circumstances, a law enforcement officer must have a warrant or consent to enter a person's home. *State v. Resler*, 209 Neb. 249, 306 N.W.2d 918 (1981). As stated, consent must be a free and unconstrained choice, not the result of a will overborne. See *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001). Investigator Mann testified that after she knocked on the upstairs door and Turner opened it, she identified herself and Willden, explained they had received a complaint, and asked if they could "come in and chat with him about it." Turner said yes and invited them inside. Investigator Kottwitz' testimony was consistent; however, Willden testified it was Bond who invited them inside. Regardless of who extended the invitation, there was no evidence that the entry into the apartment was

anything but consensual; therefore, the entry into the apartment was lawful.

We have concluded that the investigators' entries into the stairway and apartment were lawful; however, before we can turn to the voluntariness of the consents to search, we must address the legality of law enforcement's presence in the apartment for approximately 3 hours prior to obtaining the consents to search. If law enforcement's presence in the apartment for this period constituted an unreasonable and "excessively long seizure and detention," as Bond contends, brief for appellant at 16, we will be required to determine whether there was a sufficient attenuation between the illegal seizure and the consents to search. See *State v. Gorup*, 279 Neb. 841, 782 N.W.2d 16 (2010) (where consensual search follows illegal police conduct, court must determine whether consent was exploitation of prior illegality).

[4,5] Generally, a seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. *State v. Hedgcock*, 277 Neb. 805, 765 N.W.2d 469 (2009). A seizure may occur where an officer directly tells a suspect that he or she is not free to go; in addition, "circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id*. at 815, 765 N.W.2d at 479.

At a minimum, no Fourth Amendment seizure occurred during Bond and Turner's initial interaction with the investigators and Willden. The interaction consisted of a lawful entry into the apartment, noncoercive questioning regarding the hotline report, and observation of the children's sleeping area and Bond and Turner's food supply. No reasonable person would have believed he or she was not free to leave during this consensual encounter.

Likewise, no Fourth Amendment seizure of Bond and Turner occurred when Investigator Mann learned Castro had a warrant for his arrest and requested a patrol unit to transport Castro to jail. According to Investigator Mann, this process "took up some time"; however, Bond and Turner had no reason to believe they were not free to leave merely because Castro was being arrested on a warrant unrelated to the hotline report investigation.

It was only after Castro was removed from the apartment that the tenor of Bond and Turner's interaction with the investigators changed. After Castro was removed, Investigator Kottwitz observed a backpack, of which neither Bond nor Turner claimed ownership; inside the backpack, which Bond and Turner agreed could be searched, Investigator Mann found drug paraphernalia and suspected methamphetamine. There was then a discussion about consent to search the apartment and a discussion "amongst officers" about whether to seek a search warrant. Bond, who unlike Turner wanted to consent to a search of the apartment, requested that Investigator Mann accompany her to the bathroom. In the bathroom, Bond told Investigator Mann she would give up "everything" and "wanted to know if that would kind of make all this go away." After Investigator Mann told Bond she could not answer because she did not know what Bond had, Bond led her to the bedroom, where she handed the investigator a marijuana pipe, a methamphetamine pipe, and a baggie with suspected methamphetamine. Investigator Mann told Bond she still wanted to search the apartment, and the two returned to the living room, where Bond discussed with Turner whether to give consent. Bond and Turner could not agree, and Investigator Mann interrupted three or four times, each time telling them "time's ticking" and asking for a decision. Eventually, Investigator Mann said "time's up" and left to seek a search warrant while Officer Tjaden stood by in the apartment "to make sure no evidence was destroyed."

Even assuming a seizure occurred during the prolonged interaction that culminated with Officer Tjaden standing by while Investigator Mann left to seek a search warrant, no Fourth Amendment violation occurred. In *Illinois v. McArthur*, 531 U.S. 326, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001), the U.S. Supreme Court held that police officers did not violate the Fourth Amendment when they detained a man outside his trailer home for approximately 2 hours while other officers obtained a search warrant. In that case, police had probable cause to believe the man's home contained drugs; they had good reason to fear that, unless restrained, the man would destroy the drugs before they returned with a warrant; they neither searched the trailer home nor arrested the man before obtaining a warrant; and they restrained the man for a "limited period of time" of 2 hours. *Id.*, 531 U.S. at 332. The Court explained that it had "upheld temporary restraints where needed to preserve evidence until police could obtain a warrant," *id.*, 531 U.S. at 334, and noted it had found no case in which it had "held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time," *id.*

In the present case, unlike in *McArthur, supra*, police did not restrain Bond and Turner outside of their apartment while another officer obtained a warrant; instead, after the investigators lawfully entered the apartment with the consent of Bond and/or Turner, Officer Tjaden stood inside the residence observing Bond and Turner while Investigator Mann left to obtain a warrant. However, we see no reason to treat the alleged seizure of Bond and Turner inside their apartment differently than the seizure that occurred outside the trailer home in *McArthur*. As in *McArthur*, when Investigator Mann left to obtain a search warrant, the investigators had probable cause to believe the apartment contained drugs. Further, it was reasonable for Investigator Mann to believe that if she left Bond and Turner unsupervised in the apartment while

she obtained a warrant, the two would destroy any remaining evidence of drugs. Additionally, although Bond characterizes the alleged detention as "excessively long," brief for appellant at 16, it was approximately the same length as, if not shorter than, the detention in *McArthur*. Considering the totality of the circumstances, we conclude the investigators' conduct, assuming it constituted a Fourth Amendment seizure, was reasonable.

Because we have concluded the investigators' conduct prior to obtaining consents to search was not illegal, we need not address the issue of attenuation. Accordingly, we turn to the issue of the voluntariness of the consents to search.

[6-8] Consent to search must be voluntarily given and not the result of duress or coercion, whether express, implied, physical, or psychological. See *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001). In examining all the surrounding circumstances to determine if in fact a consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. *State v. Prahin*, 235 Neb. 409, 455 N.W.2d 554 (1990). Mere submission to authority is insufficient. *Tucker, supra*. Where, as here, both occupants of a jointly occupied premises are physically present, the consent of one occupant to a search is insufficient when the other occupant objects to the search. *Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006). See, also, *Fernandez v. California*, ___ U.S. ___, 134 S. Ct. 1126, 188 L. Ed. 2d 25 (2014) (declining to extend *Randolph, supra*, to situation where objecting occupant is absent when another occupant consents).

[9,10] The determination of whether consent to search is voluntarily given is a question of fact to be determined from the totality of the circumstances. *State v. Ready*, 252 Neb. 816, 565 N.W.2d 728 (1997). The burden is upon the government to prove that a consent to search was voluntarily given. *Prahin, supra*.

The district court's finding that Bond voluntarily consented to the search of the apartment was not clearly erroneous. From the moment the issue of consent to search the apartment arose, Bond wanted to consent to the search; it was only Turner who was reluctant. There is no evidence that police pressured or coerced Bond to consent to a search. Rather, the evidence clearly established that Bond was eager to cooperate with the investigators and even voluntarily handed Investigator Mann her marijuana pipe, her methamphetamine pipe, and a baggie with suspected methamphetamine. Bond's consent to the search was voluntary.

Regarding Turner's consent to the search, the district court found that "[i]f anyone overbore Turner's will, it was Bond, not the officers in question"; this finding was not clearly erroneous. There was little to no evidence that the investigators or Officer Tjaden pressured Turner into consenting to a search of the apartment. At most, the investigators discussed the issue of consent to search with Bond and Turner and told them they were leaving to obtain a search warrant after the two could not agree on whether to consent. In *Tucker, supra*, the Nebraska Supreme Court held that consent was not coerced where officers repeatedly asked a suspect for permission to enter his apartment to look for illegal items and threatened to get a search warrant, eventually leading the suspect to step back from the door with his arms raised and his hands upward and outward. Here, there was much less evidence of police pressure; in fact, when Turner ultimately agreed to consent to a search, the only law enforcement officer present in the apartment was Officer Tjaden, who was standing by and never discussed the issue of consents to search with the two suspects. Turner consented after Bond begged and pleaded with him, not upon the prompting of any police officer. The district court properly upheld the consensual search of the apartment.

*No Contact Condition of Probation.*

Bond argues the court erred in imposing a condition of probation prohibiting her from having any contact with Turner. She maintains she and Turner have been in a relationship for 8 years and that the PSR did not indicate she and Turner used drugs together. She contends the provision is overbroad and unrelated to her crime.

The State responds that Bond either invited the alleged error or waived the issue. The State points out that Bond told the court she would comply with a no-contact provision if one was imposed and notes she did not object to such a provision at the sentencing hearing. Although we recognize that during allocution, Bond indicated she "would have to" comply with a no-contact term of probation if one was imposed, we also note she stated "[i]t would be very hard" and explained she could not "shut off [her] feelings." We decline to characterize this as inviting the error of which she complains or of waiving the issue for purposes of appeal. Therefore, we address the issue on the merits.

As an initial matter, we note that the language of the no-contact provision is ambiguous. The provision states that Bond shall "[n]ot associate with individuals having a known criminal record, on parole or probation except, by permission of the Probation Officer or any person in possession of non-prescribed controlled substances to include family and significant others and specifically . . . Turner." The provision could be read as an absolute prohibition on contact with Turner; apparently, both Bond and the State have read it this way. However, it could also be read as prohibiting contact with Turner only if he is in possession of nonprescribed controlled substances; under this reading, if Turner is not in possession of nonprescribed controlled substances, then Bond may have contact with him with her probation officer's permission (since Turner has a known criminal record). We need not resolve the ambiguity, however, because even assuming the provision imposes an absolute prohibition on contact

with Turner, we conclude the provision was proper, as we now explain.

[11] In *State v. Rieger*, 286 Neb. 788, 839 N.W.2d 282 (2013), the Nebraska Supreme Court vacated a term of probation that prohibited a defendant from having contact with her husband. The defendant had been convicted of false reporting after telling police she had caused her son's bruising, when in fact her husband had caused it. On appeal, she contended the no-contact provision violated her fundamental rights inherent in the marital relationship and was not reasonably related to her rehabilitation. The court outlined the applicable law as follows:

> When a court sentences a defendant to probation, it may impose any conditions of probation that are authorized by statute. . . . The applicable statute provides that "[w]hen a court sentences an offender to probation, it shall attach such reasonable conditions as it deems necessary or likely to insure that the offender will lead a law-abiding life." These include requiring the offender to "meet his or her family responsibilities," to "refrain from frequenting unlawful or disreputable places or consorting with disreputable persons," and to "satisfy any other conditions reasonably related to the rehabilitation of the offender." We construe these provisions to authorize a no-contact condition of probation when it is reasonable and necessary to the rehabilitative goals of probation.

*Rieger*, 286 Neb. at 792-93, 839 N.W.2d at 286, quoting Neb. Rev. Stat. § 29-2262 (Cum. Supp. 2012). The court further explained that when a term of probation prohibits or restricts a probationer's contact with a spouse, the term should be narrowly tailored and reasonably related to the rehabilitative process. *Rieger, supra*.

The court in *Rieger, supra*, held that the provision prohibiting the defendant from having contact with her husband did not satisfy these requirements. It determined there was no evidence the provision was necessary to protect the defendant

from her husband, and it was unclear from the record whether the provision was necessary to protect the defendant's children. *Id*. Also, the broad no-contact provision was not narrowly tailored, since less rigorous restrictions could have been imposed to protect the children if necessary. *Id*.

The present case is distinguishable from *Rieger* in key respects. Significantly, Bond is not married to Turner. Furthermore, Bond informed the court at the sentencing hearing that Turner had recently moved out of the apartment and that prior to that, for "probably" the past year, Turner would "come and go" and Bond and Turner would sleep in separate rooms. Bond explained "it was really not a relationship." We do not believe that this "on again, off again" relationship is entitled to the same constitutional protections as the marriage in *Rieger*.

More important, however, the no-contact provision in the present case serves an important rehabilitative purpose, unlike the no-contact provision in *Rieger, supra*. As Bond's PSR revealed, she has a long history of substance abuse and a significant drug-related criminal history. The PSR indicated Bond was at high risk for recidivism and was in need of substance abuse treatment. Although Bond contends the PSR did not indicate she and Turner used drugs together, this is disingenuous; the search of Bond and Turner's apartment revealed drugs and drug paraphernalia in the bedroom they shared at the time of the search. It is difficult to imagine Bond achieving the goal of rehabilitation in such an environment. The no-contact provision, in combination with the other terms of probation that were focused on addressing Bond's substance abuse problem, was reasonably related to the rehabilitative process.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court for Hall County.

Affirmed.